## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| LIVE365, INC.,               )<br><br>     Plaintiff,          )<br><br>     v.                  )<br><br>                      )<br>COPYRIGHT ROYALTY BOARD; )<br>JAMES H. BILLINGTON, in his official )<br>capacity as Librarian of Congress; and )<br>JAMES SCOTT SLEDGE, STANLEY C. )<br>WISNIEWSKI, and WILLIAM J. ROBERTS, in )<br>their official capacities as Judges of the )<br>Copyright Royalty Board.      )<br><br>     Defendants.       )| Case No. 1:09-cv-01662 (RBW) |

## SOUNDEXCHANGE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR LEAVE TO INTERVENE AS A DEFENDANT

Pursuant to Fed. R. Civ. P. 24(a)(2), SoundExchange, Inc. ("SoundExchange") hereby submits this memorandum in support of its motion to intervene as of right as a defendant in this action in order to file an opposition to plaintiff Live365's Motion for Preliminary Injunction on September 14, 2009 and to litigate the action fully as a defendant. In the alternative, SoundExchange seeks permission to intervene pursuant to Fed. R. Civ. P. 24(b)(1).

Pursuant to Local Civil Rule 7(m), counsel for SoundExchange conferred with counsel for both parties and sought their consent to this motion. Counsel for defendants indicated they are not opposed to SoundExchange's motion to intervene. Counsel for plaintiff indicated that Plaintiff takes no position on SoundExchange's motion to intervene at this time and will determine whether to oppose after it has reviewed the motion.

## BACKGROUND

In this action, plaintiff Live365 seeks a declaratory judgment that the Copyright Royalty Judges ("CRJs") are unconstitutional, and asks this Court to enjoin an ongoing CRJ proceeding, *In the Matter of Digital Performance Right in Sound Recordings and Ephemeral Recordings*, Docket No. 2009-1 CRB ("Webcasting III proceeding"). The CRJs are the government body that, among other things, sets the rates and terms that webcasters and other services pay to copyright owners and performers for the use of copyrighted sound recordings under a statutory compulsory license. The compulsory licenses grant eligible services a license to digitally stream copyrighted sound recordings, and grant copyright owners and performers a right to be paid a royalty by the services for their use of sound recordings. 17 U.S.C. §§ 112, 114. By statute, the CRJs conduct regularly scheduled proceedings to set the rates and terms for various statutory licenses related to the digital streaming of music on a variety of platforms, including the Internet, satellite radio and cable music channels. The proceeding that Live365, a webcaster, wants to stop is the proceeding to set the rates and terms that it must pay under the statutory license for the period of 2011-2015.

SoundExchange is a 501(c)(6) not-for-profit organization that represents the interests of the recipients of the royalties set by the CRJs. *See* Declaration of Michael J. Huppe in Support of SoundExchange's Motion for Leave to Intervene, ¶ 2 ("Huppe Decl."). SoundExchange is the sole Collective designated by the CRJs to collect royalty payments from statutory licensees (digital music services, including webcasters) and to distribute those payments to copyright owners and performers under 17 U.S.C. §§ 112 and 114. 37 C.F.R. § 380.4(b). Indeed, SoundExchange's eighteen-member board includes representatives from a variety of constituencies that benefit from these royalty payments, including featured and non-featured

performers, artist unions, artist lawyers and managers, major record companies, independent record companies, and artists themselves. *See* Huppe Decl. ¶ 4. SoundExchange has approximately 9,700 record label members and 29,000 artist members. It also distributes royalties to non-members. In total, it maintains accounts for approximately 11,500 record labels and 41,000 artists. SoundExchange has made nearly 150,000 individual payments totaling more than $250 million. *See* Huppe Decl. ¶¶ 3-4.

SoundExchange is an active participant in the ongoing Webcasting III proceeding before the CRJs. The Webcasting III proceeding will set the royalty rates for the next five-year statutory period, 2011 through 2015, for the tens of millions of dollars in royalties to be collected by SoundExchange from statutory licensees (including Live365) and paid by SoundExchange to copyright owners and performers. As required by statute, the Webcasting III proceeding began in January 2009, when the CRJs published a notice soliciting parties to file petitions to participate. Like Live365, SoundExchange has participated in the proceeding since that time. On June 24, 2009, the CRJs issued an Order setting a September 29, 2009 deadline for parties to submit their written direct statements. SoundExchange has been working to meet that deadline for months. *See* Huppe Decl. ¶¶ 5-6.

SoundExchange has likewise represented the interests of copyright owners and performers in past proceedings before the CRJs to set the royalty rates and terms for webcasting services, business establishment services, so-called preexisting services and satellite radio services. *See* Huppe Decl. ¶¶ 5-7.

Whereas Plaintiff Live365 is one of many webcasting services that represent the interests of copyright users in the Webcasting III proceeding, SoundExchange is the only party to the proceeding that represents the interests of thousands of copyright owners and performers. In the

prior rate-setting proceedings for webcasting and satellite radio services, SoundExchange was

the only party that advocated on behalf of thousands of copyright owners and performers for a

meaningful increase in the rates to be paid to copyright owners and performers. *See* Huppe Decl.

¶ 7. In other words, for all intents and purposes, Webcasting III is a proceeding in which many

copyright users (the webcasting services, including Live365) are aligned against

SoundExchange.

SoundExchange is thus a central and essential participant in the Webcasting III

proceeding and other proceedings before the CRJs, and in any lawsuit (such as this one), that

would impact SoundExchange's ability to collect and distribute statutory royalties on behalf of

copyright owners and performers.[1]  While the defendants currently in this action represent the

government's public interest in the issues at hand, SoundExchange represents the private

financial and business interests of the record label and recording artist industries.

## ARGUMENT

## I.    SOUNDEXCHANGE IS ENTITLED TO INTERVENE AS OF RIGHT.

A party seeking to intervene must establish that it has standing under Article III of the

Constitution by showing (1) injury-in-fact, (2) causation, and (3) redressability. *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In addition, this Court has identified four

factors that it must consider in assessing a motion to intervene as of right:

> (1) the timeliness of the motion; (2) whether the applicant "claims an interest
> relating to the property or transaction which is the subject of the action"; (3)
> whether "the applicant is so situated that the disposition of the action may as a

---

[1] SoundExchange has been allowed to intervene in another proceeding in which webcasters and the CRJs were the original named parties.  The United States Court of Appeals for the District of Columbia Circuit granted SoundExchange's motion to intervene in the appeal of the CRJs' prior determination of webcasting royalty rates (the "Webcasting II proceeding") for the purpose of representing the interests of copyright owners and performers. *See Intercollegiate Broadcast System, Inc. v. Copyright Royalty Board*, 574 F.3d 748 (D.C. Cir. 2009).

practical matter impair or impede the applicant's ability to protect that interest";
and (4) whether "the applicant's interest is adequately represented by the existing
parties."

*Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003).

As set forth below, SoundExchange satisfies all of the requirements for intervention as of
right.

### A.    SoundExchange Has Standing.

The threshold issue is whether SoundExchange has standing to intervene.
SoundExchange easily meets the traditional test for standing because it has a legally protected
interest in avoiding the injury that would be caused if Live365 were successful in obtaining the
relief it seeks in this lawsuit.  As the sole Collective designated by the CRJs to collect and
distribute the statutory royalties at issue, SoundExchange is uniquely situated to represent the
interests of copyright owners and performers that are threatened by Plaintiff's requested relief
but are not otherwise represented in this lawsuit.

SoundExchange collects and distributes statutory royalties on behalf of thousands of
sound recording copyright owners and performers.  In the Webcasting III proceeding that
plaintiff Live 365 wants to enjoin, SoundExchange is the only party that has been previously
designated as the sole Collective for copyright owners and performers and that represents these
interests.  The CRJs set the royalty rates that webcasting services (such as Live365) pay to
SoundExchange pursuant to a compulsory license established by Congress.  *See* 17 U.S.C.
§§ 114(f), 803.  The compulsory license (1) grants webcasting services a license to use
copyrighted sound recordings, and (2) grants copyright owners and performers a right to be paid
a royalty by the webcasting services for their use of sound recordings.  Thus, the compulsory
license enacted by Congress strikes a balance between webcasting services on the one hand and

5

copyright owners and performers on the other. A webcasting service such as Live365 can digitally stream copyrighted sound recordings without permission from the copyright owners, but only so long as it complies with the requirements of the compulsory license including by paying SoundExchange the royalty rate set by the CRJs. And while copyright owners and performers are entitled to be paid the royalty rates set by the CRJs, they cannot prevent webcasting services that comply with the terms of the compulsory license from using their sound recordings.

Plaintiff Live365's lawsuit threatens to harm SoundExchange and the copyright owners and performers whose interests it represents by preventing the CRJs from setting the royalty rates for the upcoming five-year period of 2011-2015 and disrupting this statutory scheme. *See* Huppe Decl. ¶¶ 8-9. If Live365 were to prevail in this lawsuit, webcasting services would continue to be able to use sound recordings under the statutory license, but there would be no means to set an appropriate rate for the next term. Thus, webcasting services such as Live365 would still reap the benefit of the statutory bargain (the use of sound recordings without the need to obtain private licenses), but SoundExchange and copyright owners and performers could be denied their benefit of the statutory bargain (royalties set by the CRJs) if webcasting services paid at obsolete rates or if some simply chose not to pay at all.

SoundExchange has a legally protected interest in avoiding this harm. Indeed, if plaintiff were to prevail in its efforts to have this Court declare the CRJs unconstitutional and enjoin further proceedings by the CRJs, SoundExchange and its members could suffer the loss of tens of millions of dollars in royalties that would otherwise be paid pursuant to the rates set by the CRJs in the Webcasting III proceeding. Such a ruling by this Court could also cast doubt on past royalties paid by statutory licensees to SoundExchange at rates set by the CRJs. SoundExchange, copyright owners and performers would also be harmed by the uncertainty that

would be caused by declaring the CRJs unconstitutional and enjoining the Webcasting III

proceeding. Congress has required that the royalty rates at issue must be set by December 16,

2010. 17 U.S.C. § 803(c)(1). If the proceeding is enjoined, but Live365 ultimately does not

prevail, then SoundExchange, the CRJs, and the other parties would be forced to complete

Webcasting III on an even more compressed schedule than they already face. Or, if the deadline

is moved beyond that date, then webcasters and SoundExchange would enter the next term

without knowing what the rates are. There could be considerable confusion among webcasters

about what rates to pay, and some webcasters might choose to simply stop paying altogether,

even as they continued to take advantage of the compulsory license to digitally stream sound

recordings. There are hundreds of statutory licensees from whom SoundExchange must collect

royalty payments and whose data SoundExchange must track to ensure efficient and accurate

payments to copyright owners and artists. It would be extremely disruptive to the music industry

if SoundExchange received incorrect payments from licensees and if it later had to determine the

adjustments necessary to bring those payments into compliance with the correct rates.

   Moreover, SoundExchange depends on payments from statutory licensees to fund its

operations. The task of collecting royalties for the millions of recordings played by webcasting

and other digital music services each year and distributing them to the appropriate recipients is a

major undertaking. Because the relief that Live365 seeks threatens to interfere with the payment

of royalties, it could have a substantial negative impact on SoundExchange's ability to continue

its operations at full capacity. *See* Huppe Decl. ¶ 10.

   SoundExchange has thus demonstrated that "there is a real likelihood [it] will sustain a

direct injury if the plaintiffs prevail in obtaining any of the relief they are requesting," and that it

has constitutional standing. *County of San Miguel v. MacDonald*, 244 F.R.D. 36, 44 (D.D.C.

2007); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (holding

that party asserting future injury "must demonstrate a realistic danger of sustaining a direct

injury"). Indeed, this Court has found that intervenor-applicants had constitutional standing

where the potential injuries were much more attenuated. *See County of San Miguel*, 244 F.R.D.

at 45 (finding standing where "intervenor-applicants' members' economic status would be

threatened"). By contrast, a ruling by this Court against Live365 and in favor of defendants

would ensure that the statutory and regulatory regime on which SoundExchange and its

constituents rely would remain in place and that the collection of tens of millions of dollars of

royalties would proceed unabated, thus avoiding the potential harm.

SoundExchange also meets the standard for associational standing. An association has

standing on behalf of its members if "(a) its members would otherwise have standing to sue in

their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and

(c) neither the claim asserted nor the relief requested requires the participation of individual

members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343

(1977). First, the thousands of copyright owners and performers whose interests SoundExchange

represents rely on the CRJs' authority to set rates to receive their statutory royalties. Just as

webcasting services have an interest in the rates that the CRJs set because they must pay those

rates, the copyright owners and performers have an interest in the rates that the CRJs set because

they are entitled to receive royalties paid at those rates. The copyright owners and performers

could seek judicial intervention themselves related to the constitutionality of the CRJs and the

royalty rates they set. Second, SoundExchange seeks to protect interests in preserving the

royalty-setting proceedings and the royalties set by the CRJs and paid to SoundExchange for

distribution to copyright owners and performers. These interests are directly related to

SoundExchange's core purpose of collecting and distributing these statutory royalties to copyright owners and performers. Third, the relief that SoundExchange would seek as a defendant – a declaration that the CRJs are constitutional and a denial of plaintiff's efforts to enjoin ongoing CRJ proceedings – would not require any of its members to participate individually.

**B.    SoundExchange's Motion to Intervene Is Timely.**

There can be no dispute that SoundExchange's motion is timely. The assessment of timeliness is discretionary and should be "judged in consideration of all the circumstances." *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 5 (D.D.C. 2008) (quoting *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1295 (D.C. Cir. 1980)). Plaintiff filed this action on August 31, 2009, and filed its motion for a preliminary injunction on September 2, 2009. No further action has yet occurred in the case, and responses to the complaint are not due for several weeks. The first deadline is the September 14 date for the filing of defendant's opposition to the motion for preliminary injunction. SoundExchange is seeking leave to intervene so that it may file an opposition to the motion for a preliminary injunction, which it is also submitting today. Thus, SoundExchange's participation would not delay consideration of the immediate injunctive relief that Live365 seeks. Nor would it slow down ultimate resolution of the case or otherwise cause any prejudice to the parties already in the case. *See Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 129 (D.C. Cir. 1972).

**C.    SoundExchange Has an Interest in the Action.**

The District of Columbia Circuit has held that a party's showing of constitutional standing is sufficient to demonstrate an interest relating to the transaction for purposes of assessing a motion to intervene. *Jones v. Prince George's County*, 348 F.3d 1014, 1018-19

(D.C. Cir. 2003); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) (stating that a party seeking intervention "need not show anything more than that it has standing to sue in order to demonstrate the existence of a legally protected interest for purposes of Rule 24(a)").

For the same reasons that SoundExchange has set forth above to establish standing – including disruption of the statutory scheme that establishes a legally protected interest in royalties and the injury resulting from tens of millions of dollars in unpaid royalties if plaintiff were to prevail – SoundExchange meets this prong of the Rule 24(a) test for intervention as of right.

**D.    Disposition of the Action Would Substantially Impair SoundExchange's Ability to Protect Its Interests.**

SoundExchange has a substantial interest in the proceedings conducted by the CRJs and the royalty rates they set. It is the sole Collective designated by the CRJs to collect and distribute statutory royalties for tens of thousands of copyright owners and performers. A ruling against defendants in this proceeding would have a substantial negative impact on SoundExchange's ability to protect its interests and the interests of the copyright owners and performers whose interests it represents. If the Court were to grant Live365 the relief it seeks, SoundExchange could be deprived of tens of millions of dollars of statutory royalties to collect from licensees and to distribute to copyright owners and performers. *See, e.g., County of San Miguel*, 244 F.R.D. at 47 (holding that "imminent threat of lost earnings" resulting from Court ruling "would immediately impair the intervenor-applicants' members economic interests" and thus satisfy this prong of the test for a motion to intervene). A ruling that the CRJs are unconstitutional would likely cause some licensees to cease paying royalties pursuant to rates set by CRJs in the past, and a ruling to enjoin the current Webcasting III proceeding would prevent

10

SoundExchange from receiving payments at an appropriately adjusted rate from licensees in the future. It is entirely speculative whether SoundExchange could ever obtain make-up payments from webcasters down the road that would make up for the shortfalls it may experience now if Live365 succeeds in this litigation. *See* Huppe Decl. ¶¶ 8-9. Accordingly, an adverse ruling would substantially impair SoundExchange's ability to protect its interests, and the interests of copyright owners and performers, that are at stake in this action.

### E. SoundExchange's Interests Are Not Adequately Represented by the Existing Parties.

The current parties do not adequately represent SoundExchange's interests. The Supreme Court has held that this prong of the test for intervention is satisfied "if the applicant shows that representation of [its] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (citation omitted). Where the government is a party and a private party seeks to intervene, the District of Columbia Circuit has "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals*, 322 F.3d at 736 (footnote omitted). As this Court has explained, "government entities are usually charged with 'represent[ing] the interests of the American people,' whereas aspiring intervenors . . . are dedicated to representing their personal interests or the interests of their members of members' businesses." *County of San Miguel*, 244 F.R.D. at 48 (quoting *Fund for Animals*, 322 F.3d at 736); *Dimond v. District of Columbia*, 792 F.2d 179, 192-93 (D.C. Cir. 1986) (party seeking to protect its own economic stake in a lawsuit had sufficiently different interests than government defendants primarily concerned with representing the public interest).

That rationale applies here. Although the government defendants in this case and SoundExchange may share a common interest in upholding the constitutionality of the CRJs, the

11

government does not share SoundExchange's specific economic interest in protecting the royalty payments for the thousands of copyright owners and performers to whom SoundExchange distributes royalties. This private financial and business interest is distinct from the government's public interest and is not adequately represented by the government defendants. *County of San Miguel*, 244 F.R.D. at 48 (finding this prong of the test for a motion to intervene satisfied where the government entity's public interests were not identical to intervenor-applicants' interests in "protecting their members' livelihoods and business operations"). SoundExchange can thus provide a perspective on the potential harm to the copyright owner and recording artist industries that is different from the government's views of the public interest in the case. Moreover, as the sole Collective designated by the CRJs to collect and distribute the statutory royalties at issue, SoundExchange has institutional interests in the administration of the statutory license that may not be adequately represented by the government.

## II.    IN THE ALTERNATIVE, SOUNDEXCHANGE IS ENTITLED TO PERMISSIVE INTERVENTION.

If this Court finds that SoundExchange is not entitled to intervention as of right, then it should grant SoundExchange permissive intervention. Rule 24(b) allows permissive intervention where a movant presents "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998). In addition, a court must determine "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). The Court "enjoys considerable discretion under Rule 24(b)." *Envtl. Defense v. Leavitt*, 329 F. Supp. 2d 55, 66 (D.D.C. 2004) (citing *Nat'l Children's Ctr.*, 146 F.3d at 1046).

SoundExchange satisfies the test for permissive intervention. First, the requirement of an independent ground for jurisdiction "stems not from any explicit language in Rule 24(b), but rather from the basic principle that a court may not adjudicate claims over which it lacks subject matter jurisdiction." *Nat'l Children's Ctr.*, 146 F.3d at 1046. In this case, Live365 has asserted federal jurisdiction under 28 U.S.C. § 1331, the federal question statute. SoundExchange's intervention to defend against Live365's constitutional claims would not affect the Court's jurisdiction based on § 1331. Instead, SoundExchange's defenses are directly related to the main claims in the case over which this Court has federal question jurisdiction.

Second, for the reasons set forth above, SoundExchange's motion to intervene is timely. The case has just begun, and SoundExchange has promptly filed this motion to intervene.

The third requirement for permissive intervention is met when "[t]he facts necessary to assert [the intervenor's] claim are essentially the same facts as those necessary to establish [an existing party's] claim." *Me-Wuk Indian Cmty. of Wilton Rancheria v. Kempthorne*, 246 F.R.D. 315, 320 (D.D.C. 2007). In this case, SoundExchange's defense presents questions of law and fact almost entirely in common with the issues raised by Live365 and likely to be raised by the government defendants. In particular, the core facts related to the appointment of the CRJs are the same facts necessary for all parties to establish their constitutional claims.

Finally, allowing SoundExchange to intervene will not delay the case or prejudice the parties. This case is at its earliest stages. Plaintiff has sought expedited relief through a motion for a preliminary injunction, and SoundExchange does not propose to slow down that process in any way. To the contrary, SoundExchange has abided by the schedule ordered by this Court and is submitting an opposition to plaintiff's motion for preliminary injunction today – the same date on which the government defendants will submit its opposition. Nor is there any basis for

believing that SoundExchange's participation would prejudice plaintiff in any way or otherwise confuse this case.

## CONCLUSION

For the foregoing reasons, SoundExchange's motion to intervene should be granted.

Respectfully Submitted,

By: _____

| | |
|---|---|
| Michael J. Huppe (DC Bar No. 455161) | Paul M. Smith (DC Bar No. 358870) |
|   General Counsel | Jared O. Freedman (DC Bar No. 469679) |
| C. Colin Rushing (DC Bar No. 470621) | Craig A. Cowie (DC Bar No. 491707) |
|   Senior Counsel | JENNER & BLOCK LLP |
| SoundExchange, Inc. | 1099 New York Ave., N.W. |
| 1121 14th Street, N.W., Suite 700 | Washington, D.C. 20001 |
| Washington, D.C. 20005 | (v) 202-639-6000 |
| (v) 202-640-5880 | (f) 202-661-4846 |
| (f) 202-640-5883 | psmith@jenner.com |
| mhuppe@soundexchange.com | jfreedman@jenner.com |
| crushing@soundexchange.com | ccowie@jenner.com |
| | |
| *Of counsel* | *Counsel for SoundExchange, Inc.* |

Dated: September 14, 2009