UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LIVE365, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:09-01662 (RBW) |
| | ) | |
| COPYRIGHT ROYALTY BOARD, et al., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DEFENDANTS' MOTION TO DISMISS

Defendants, by their undersigned attorneys, hereby move, pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure, to dismiss. The ground for this motion is that the Court lacks subject matter jurisdiction over this action. In support of this motion, the Court is respectfully referred to the Memorandum of Points and Authorities 1) In Support of Defendants' Motion To Dismiss, and 2) In Opposition to Plaintiff's Motion for Preliminary Injunction, filed herewith.

Dated:  September 14, 2009           Respectfully submitted,

TONY WEST
Assistant Attorney General

CHANNING D. PHILLIPS
Acting United States Attorney

SUSAN K. RUDY
Assistant Director
Federal Programs Branch

ELIZABETH A. PUGH
General Counsel
Library of Congress
LM 601 - Madison Building
101 Independence Ave.
Washington, DC  20540
Phone: (202) 707-2257

/s/ Brian G. Kennedy
BRIAN G. KENNEDY
    (DC Bar No. 228726)
LISA ZEIDNER MARCUS
    (NY Bar No. 4461679)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, D.C.  20530
Telephone:  (202) 514-3357
Fax:  (202) 616-8470
Email: brian.kennedy@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LIVE365, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:09-01662 (RBW) |
| | ) | |
| COPYRIGHT ROYALTY BOARD, et al., | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
1) IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS AND 2) IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................... 1

STATEMENT OF THE CASE ............................................................. 3

    A.    Statutory Background: Statutory Licensing
           As A Limit on Copyright Holders' Exclusive Rights,
           And Rate-Setting Under The Copyright Act ........................................ 3

    B.    Prior Rate-Setting For The Webcasting Statutory Licenses .............. 6

    C.    The Current (Webcaster III) Proceeding ........................................... . 7

    D.    Plaintiff's Claims .................................................................. 9

ARGUMENT ...................................................................................... 10

I.    THIS COURT LACKS SUBJECT-MATTER JURISDICTION
    TO CONSIDER PLAINTIFF'S DEMAND THAT THIS COURT
    DECIDE THE TIMING OF PROCEEDINGS SUBJECT TO
    EXCLUSIVE REVIEW IN THE COURT OF APPEALS................................10

II.    LIVE365 DOES NOT MEET THE STANDARD
    FOR OBTAINING A PRELIMINARY INJUNCTION....................................15

    A.    Live365 Does Not Show A Likelihood Of Success On The Merits........15

           1.    The Copyright Royalty Judges Are,
                 At Most, Inferior Officers, Not Principal
                 Officers, Under the Appointments Clause..................................17

           2.    Copyright Royalty Judges Are Appointed By
                 The Librarian of Congress — A Head Of A Department
                 Within The Meaning Of The Appointments Clause...................22

                 a.    The Librarian Is A Principal Officer..................................23

                 b.    The Library Is An Executive Department
                      For Appointments Clause Purposes.................................25

                 c.    Live365 Mistakes Statutory
                      Labels For Constitutional Authority..............................28

B.   Live365 Is Not Likely To Sustain Irreparable
Harm That A Preliminary Injunction Would Avoid.............................32

1.   Even If Live365 Were To Incur Unrecoupable Litigation
Expenses As A Result Of Its Decision To Participate
In Webcaster III, As A Matter Of Law Unrecoupable
Litigation Expense Is Not Irreparable Injury............................33

2.   Live365 Does Not Demonstrate That A Preliminary
Injunction Would Likely Save Live365 From
Incurring Otherwise Wasted Litigation Costs............................37

C.   The Balance Of Equities Does Not Tip In Live365's Favor
And An Injunction Would Be Contrary To The Public Interest............40

CONCLUSION.................................................................43

## INTRODUCTION

Live365 raises an Appointments Clause issue that the Court of Appeals has said would be unwise to resolve on the basis of "hasty, inadequate, and untimely briefing." *Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 571 F.3d 69, 76 (D.C. Cir. 2009). If "hasty . . . briefing" is a problem, a preliminary injunction proceeding should make no one's short list of solutions.

Haste might be justified if irreparable harm were impending, but such harm is nowhere in sight. Live365 claims that it will have to expend considerable efforts in a copyright license rate-setting proceeding ("*Webcaster III*" or the "proceeding") that might go for naught if the Copyright Royalty Judges who preside over the proceeding are later found to have been improperly appointed.

But incurring litigation expense, even where that expense can never be recouped, is not irreparable harm as a matter of law. *Federal Trade Commission v. Standard Oil Co.*, 449 U.S. 232, 244 (1980). The Court of Appeals has already so held in the precise context of an interlocutory Appointments Clause challenge to an ongoing proceeding. *Deaver v. Seymour*, 822 F.2d 66, 68–70 (D.C. Cir. 1987).

In any event, no matter what the courts might ultimately rule on Live365's Appointments Clause question when it is properly presented, it is unlikely that the efforts Live365 and other parties devote to the proceedings will be entirely wasted. If a district judge becomes unable to continue with a case and has to be replaced, the record developed before the original judge may still be considered by her successor, Fed. R. Civ. P. 63. If Live365 were eventually to prevail on its merits

claim and it became necessary to appoint new decisionmakers, Congress could similarly direct that the pre-existing record be used rather than discarded.

In contrast to the lack of irreparable harm shown by Live365, the delay in the *Webcaster III* proceeding that Live365 seeks would harm the defendants and the other parties to that proceeding, which is currently set on a schedule carefully designed by Congress, 17 U.S.C. § 803, to allow parties the time needed to prepare the necessary, and usually extensive, submissions while still permitting the rates to be set in a prompt manner. *See Nken v. Holder*, 129 S. Ct. 1749, 1762 (2009) (public interest adversely affected by injunction "undermin[ing]" procedures established by Congress for "prompt" resolution of issues).

Live365 has also failed to show the required likelihood of success on the merits. Copyright Royalty Judges are appointed by the Librarian of Congress, who heads the Library of Congress and is appointed by the President with the advice and consent of the Senate. This arrangement fully satisfies the Appointments Clause. *See, e.g., Edmond v. United States*, 520 U.S. 651 (1997); *Eltra Corp. v. Ringer*, 579 F.2d 294, 300 (4th Cir. 1978).

More fundamentally, Live365 has failed to show that this Court has subject matter jurisdiction to decide the merits, preliminarily or otherwise. Because the Court of Appeals will have jurisdiction over any appeal from a final decision of the Copyright Royalty Judges, *see* 17 U.S.C. § 803(d), it also has exclusive jurisdiction over any interlocutory challenges to a specific ongoing proceeding that may later ripen into a final decision. *Compare Telecomms. Research & Action Ctr. v. F.C.C.*,

750 F.2d 70, 74-75 (D.C. Cir. 1984) (stating that rule) *with Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667, 670–71 (D.C. Cir. 2008) (exception in Appointments Clause case found not tied to a particular ongoing proceeding), *cert. granted*, 129 S. Ct. 2378 (2009).  For that reason, in addition to opposing Live365's motion for preliminary injunction, defendants also move to dismiss for lack of subject matter jurisdiction.

## STATEMENT OF THE CASE

A. **Statutory Background: Statutory Licensing As A Limit on Copyright Holders' Exclusive Rights, And Rate-Setting Under The Copyright Act**

A copyright owner enjoys a set of exclusive rights, granted by Congress, to control reproduction, adaptation, distribution, and public display or performance of a protected work.  17 U.S.C. § 106.  A person who wishes to use a copyrighted work generally must get permission from the copyright owner directly before using the work.  The permission may take any number of forms, such as a license that allows use of a work in exchange for payment of a fee to the copyright owner.

The Copyright Act includes a number of limitations on the exclusive rights of copyright owners, *see generally* 17 U.S.C. §§ 107–22, including "statutory licensing" schemes that in certain instances replace the exclusive rights of a copyright owner to control her work with statutory licenses that permit others to use copyrighted works without the copyright owner's consent.  (Such statutory licenses are thus also sometimes referred to as "compulsory licenses" though the compulsion is directed at the copyright holder rather than at Live365 and others who may wish to

use the licenses.)  If a person chooses to take advantage of a statutory license rather than negotiating directly with the owner of a copyright, he must then adhere to statutory formalities and pay royalties to the copyright owner.

From 1909 until 1976, statutory royalty rates were fixed by federal statute. *See* 70 Fed. Reg. 30901 (May 31, 2005) (discussing the history of royalty ratemaking under the Copyright Act).  Since then, however, Congress has vested responsibility for setting and adjusting such rates in a series of administrative bodies.  *See id.* The first such agency was the Copyright Royalty Tribunal, a stand-alone agency that operated for more than fifteen years.  *See* Copyright Act of 1976, Pub. L. No. 94-553, § 801, 90 Stat. 2541, 2594; 70 Fed. Reg. 30901.  In 1993, finding that the workload of the Copyright Royalty Tribunal did not justify its cost, *see* H. Rep. No. 103-286, at 9 (1993), Congress eliminated the Tribunal and transferred its functions to the Librarian of Congress.  *See* Copyright Royalty Tribunal Reform Act of 1993, Pub. L. No. 103-198, 107 Stat. 2304 (1993).  The Librarian established statutory licensing fees with assistance from *ad hoc* Copyright Arbitration Royalty Panels (CARPs).  *Id*; *see also*, *e.g.*, *Program Suppliers v. Librarian of Congress*, 409 F.3d 395, 397 (D.C. Cir. 2005); *Beethoven.com LLC v. Librarian of Congress*, 394 F.3d 939, 944-45 (D.C. Cir. 2005).

In 2004, Congress eliminated the arbitration process and placed responsibility for royalty ratemaking in a panel of three Copyright Royalty Judges. *See* Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2341 (2004) (codified at 17 U.S.C. §§ 801 *et seq.*); *Intercollegiate Broad.*

*Sys. v. Copyright Royalty Bd.*, 571 F.3d 69, 74 (D.C. Cir. 2009) (per curiam). "The expectation [was] that the Copyright Royalty Judges, appointed to staggered, six-year terms, [would] provide greater decisional stability, yielding the advantages of the former Copyright Royalty Tribunal, but with greater efficiency and expertise." 70 Fed. Reg. at 30901.

In order to assure compliance with the Appointments Clause, Congress chose to vest the authority of appointing the Copyright Royalty Judges with the Librarian of Congress, "an officer of the United States nominated by the President with the advice and consent of the Senate." H.R. Rep. No. 108-408, at 22 (2004). The Librarian appoints three full-time Judges (one of them as the Chief Copyright Judge). 17 U.S.C. § 801. These Copyright Royalty Judges are located in the Library of Congress. *Id.* § 801(e). They preside over rate-making proceedings with detailed statutory requirements and must act in accordance with regulations issued by the Librarian of Congress as well as any regulations that they may themselves issue after receiving approval from the Librarian. *Id.* § 803. The Register of Copyrights, who is also appointed by the Librarian of Congress, *id.* § 701(a), provides guidance to the Copyright Royalty Judges on issues of copyright law, *id.* § 802(f)(1)(D), and reviews the decisions of the Copyright Royalty Judges for legal error, *id.* § 802(f)(1)(D). The Librarian of Congress also oversees the Copyright Royalty Judges and is authorized to remove the Judges for "violation of the standards of conduct adopted [by the Librarian], misconduct, neglect of duty, or any disqualifying physical or mental disability." 17 U.S.C. § 802(i).

### B.   <u>Prior Rate-Setting For The Webcasting Statutory Licenses</u>

Copyright Royalty Judges set rates for statutory licenses.  *See* 17 U.S.C. §
801(b)(1).  This case specifically concerns rate-setting for "webcasting" — that is,
the transmission of copyrighted sound recordings over the internet.  Since 1998, the
Copyright Act has provided a statutory license for webcasting, as well as a related
statutory license for the creation of "ephemeral" (temporary) copies created in the
process of webcasting.  *See* 17 U.S.C. §§ 114(d)(2) & (f)(2); <u>id.</u> § 112(e)(4)
(collectively, the "webcasting statutory license").  Under these provisions, the rates
and terms of webcasting statutory licenses are to be settled through voluntary
negotiation among the interested parties or, if the parties cannot agree, through
ratemaking proceedings before the Copyright Royalty Judges.

In the last webcasting proceeding before the Copyright Royalty Judges —
known as *Webcaster II* — the Copyright Royalty Judges heard thirty-nine witnesses
provide testimony over forty-eight days before arriving at a decision on reasonable
rates and terms for the statutory license.  *Intercollegiate Broad. Sys.*, 571 F.3d 69 at
73-74.  On direct review in the Court of Appeals, one party argued in supplemental
briefs that the manner in which the judges were appointed violated the
Appointments Clause of the Constitution.  *Id.* at 75.  The Court of Appeals "declined
to resolve this 'important question of far-reaching significance,' *Carducci v. Regan*,
714 F.2d 171, 177 (D.C. Cir. 1983), on the basis of hasty, inadequate, and untimely
briefing."  571 F.3d at 76.  On the merits, the Court of Appeals affirmed most of the

judges' determinations, though it did vacate on one point and remand on a second. *Id.* at 76–92.

### C.    The Current (*Webcaster III*) Proceeding

The current *Webcaster III* proceeding will set reasonable rates and terms for 2011 through 2015 with respect to parties who are not able to reach voluntary agreement.  Complaint ¶ 26.

Congress required that the proceeding begin no later than January 5, 2009, by which time interested parties may file petitions to participate.  17 U.S.C. § 803(b)(1)(A).  Congress mandated that the filing of petitions be followed by a three-month period for the participants to engage in voluntary negotiations.  17 U.S.C. § 803(b)(3).  Live365 was not among the parties that were able to reach agreement in this period.  Declaration of N. Mark Lam, Docket # 5-2 ("Lam Decl.") ¶ 10.

"The written direct statements and written rebuttal statements of all participants in a proceeding under paragraph (2) shall be filed by a date specified by the Copyright Royalty Judges, which, in the case of written direct statements, may be not earlier than 4 months, and not later than 5 months, after the end of the voluntary negotiation period."  17 U.S.C. § 803(b)(6)(C)(i).  Plaintiff alleges that period ended on May 24, 2009 (Pl. Mem. at 20 n.13), and on June 24 the judges issued an order allowing parties who were unable to reach agreement to file their written direct statements by September 29.  Complaint ¶ 30; Lam Decl. ¶ 5.

 "Discovery in connection with the written direct statements shall be permitted for a period of 60 days, except for discovery ordered by the" judges in

connection with matters pending at the end of that period, and the judges "may order a discovery schedule in connection with written rebuttal statements."  17 U.S.C. § 803(b)(6)(C)(iv).  A settlement conference outside the presence of the judges is required during the 21-day period following the close of discovery.  17 U.S.C. § 803(b)(6)(C)(x).

If a settlement is not reached among all participants, proceedings before the judges may be lengthy as a practical matter, Lam Decl., though they are not required by statute to be lengthy.  The proceedings must, in any event, conclude early enough to leave the judges time to deliberate and then reach a decision no later than December 16, 2010.  17 U.S.C. § 803(d)(1); Complaint ¶ 27.

The judges' decision may be reviewed by the Register of Copyrights :

The Register of Copyrights may review for legal error the resolution by the Copyright Royalty Judges of a material question of substantive law under this title that underlies or is contained in a final determination of the Copyright Royalty Judges.  If the Register of Copyrights concludes, after taking into consideration the views of the participants in the proceeding, that any resolution reached by the Copyright Royalty Judges was in material error, the Register of Copyrights shall issue a written decision correcting such legal error, which shall be made part of the record of the proceeding.  The Register of Copyrights shall issue such written decision not later than 60 days after the date on which the final determination by the Copyright Royalty Judges is issued.  Additionally, the Register of Copyrights shall cause to be published in the Federal Register such written decision, together with a specific identification of the legal conclusion of the Copyright Royalty Judges that is determined to be erroneous.  As to conclusions of substantive law involving an interpretation of the statutory provisions of this title, the decision of the Register of Copyrights shall be binding as precedent upon the Copyright Royalty Judges in subsequent proceedings under this chapter.  When a decision has been rendered pursuant to this subparagraph, the Register of Copyrights may, on the basis of and in

> accordance with such decision, intervene as of right in any appeal of a
> final determination of the Copyright Royalty Judges . . . .

17 U.S.C. § 802(f)(D).  Once the Register of Copyrights has had that opportunity to

review the judges' determination, the Librarian of Congress is to publish the judges'

determination and "any corrections thereto" in the *Federal Register*.  17 U.S.C. §

803(c)(6).

Judicial review may be sought within thirty days after *Federal Register*

publication in "the United States Court of Appeals for the District of Columbia

Circuit."  17 U.S.C. § 803(d).

### D.    Plaintiff's Claims

Plaintiff Live365 is one of the parties that has chosen to participate in the

*Webcaster III* proceeding.  Complaint ¶ 29.  Live365 contends that the manner in

which the Copyright Royalty Judges were appointed violates the Appointments

Clause of the Constitution.  *Id.* ¶ 1.  In a declaration supporting its preliminary

injunction papers, Live365 asserts that attorneys fees and other expenses over the

full course of its participation in the *Webcaster III* proceeding will exceed a million

dollars.  Lam Decl. ¶ 9.  In particular, Live365 asserts that the written direct

statements required to begin the proceeding involve "no ordinary briefs."  *Id.* ¶ 7.

This "intricate and time-consuming process" for filing those briefs will allegedly

require Live365, "[m]ost significantly," to "locate and retain expert witness(es),"

then "prepare written statements," including "a thorough written statement" from

each of the experts that Live365 locates and retains.  *Id.*  ¶ 6.  The deadline for

Live365 to accomplish all these tasks is September 29, 2009.  *Id.*

Live365 asks for a preliminary injunction that would suspend the September

29 and other procedural deadlines in the *Webcaster III* proceeding.  Proposed

Preliminary Injunction Order.

## **ARGUMENT**

### I.  **THIS COURT LACKS SUBJECT-MATTER JURISDICTION TO CONSIDER PLAINTIFF'S DEMAND THAT THIS COURT DECIDE THE TIMING OF PROCEEDINGS SUBJECT TO EXCLUSIVE REVIEW IN THE COURT OF APPEALS**

"Any determination" of the Copyright Royalty Judges in the *Webcaster III*

proceeding is subject to judicial review before the United States Court of Appeals

for the District of Columbia Circuit.  17 U.S.C. § 803(d)(1); *see Intercollegiate Broad.*

*Sys. v. Copyright Royalty Bd.*, 571 F.3d 69, 74 (D.C. Cir. 2009).  Because that

jurisdiction for judicial review of the *Webcaster III* proceeding is exclusive, it

forecloses Live365's attempt to ask a different court to decide upon the scheduling

of that same proceeding.

The seminal case on this point in this circuit is *Telecommunications Research*

*& Action Center v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*").  In *TRAC*, as here,

jurisdiction to review final action was vested in the Court of Appeals; as here, there

had not yet been such a final action; and, as here, the plaintiff sought interlocutory

relief related to the timing of the underlying proceeding.  750 F.3d at 72, 74–75.

The Court of Appeals held that the "lack of finality . . . does not automatically

preclude" Court of Appeals jurisdiction over that proceeding.  *Id*. at 75.  The Court

of Appeals went on to hold that its "present jurisdiction over claims that affect" its

"future statutory review authority is exclusive." *Id*. at 77.  As the Court of Appeals

explained, "[b]y lodging review of agency action in the Court of Appeals, Congress

manifested an intent that the appellate court exercise sole jurisdiction over the

class of claims covered by the statutory grant of review power." *Id*.[1]

The Supreme Court addressed similar issues in *Thunder Basin Coal Co. v.*

*Reich*, 510 U.S. 200 (1994).  In that case, as here, a plaintiff argued that pending

administrative proceedings were unconstitutional and sought an injunction in a

district court to halt the proceedings.  510 U.S. at 205.  However, because the

statutory scheme vested exclusive jurisdiction to review final agency action in the

courts of appeals, *id*. at 208, the Supreme Court concluded that district court review

over interlocutory constitutional claims was precluded, *id*. at 218.

The Court of Appeals created a limited exception to these principles in *Time*

*Warner Entertainment Co. v. F.C.C.*, 93 F.3d 957 (D.C. Cir. 1996).  That case

---

[1]  Even if the Court of Appeals' exclusive jurisdiction were not a bar to this Court assuming jurisdiction it would otherwise have to review agency action, Live365 points to no applicable waiver of sovereign immunity that would permit this case to be brought in a district court.  The waiver that applies to most actions seeking review of agency decisions, the Administrative Procedure Act, does not apply to the Library of Congress, something that Live365 itself points out, Pl. Mem. at 16, *citing Washington Legal Found. v. Sentencing Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994).  The express statutory procedures for review in the Court of Appeals "impliedly forbid[ ]" relief in a freestanding action in district court, *see* 5 U.S.C. § 702.  Nor, in any event, does Live365 identify any final "agency action" properly subject to challenge under the APA's waiver of immunity, *see* 5 U.S.C. § 704.

involved a "facial challenge" to the constitutionality of a statute under which the agency was proceeding.  93 F.3d at 965.  The Court of Appeals observed that one "policy reason" supporting the exclusivity rule of *TRAC* was not implicated because resolving a facial constitutional challenge "do[es] not require any particular agency expertise."  *Id.*  By itself, of course, that observation would not justify creating an exception to *TRAC*.  *See Thunder Basin*, 510 U.S. at 215 ("rule" that constitutional claims may not be considered by agencies "is not mandatory" and "[e]ven if this were not the case" the claim of unconstitutionality "can be meaningfully addressed in the Court of Appeals").  Thus, according to *Time Warner*, even where the claim is a facial challenge to the constitutionality of a statute, a district court would have jurisdiction only "so long as that challenge is not raised in a suit challenging the validity of agency action taken pursuant to the challenged statute or in a suit that is collateral to one challenging the validity of such action."  93 F.3d at 965.  In *Time Warner*, district court jurisdiction was allowed because, as the Court of Appeals said in distinguishing its prior precedents, Time Warner's case was "entirely independent of any agency proceedings, whether actual or prospective."  *Id.*

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667 (D.C. Cir. 2008), *cert. granted*, 129 S. Ct. 2378 (2009), arguably expands the *Time Warner* exception.  In that case, as here, a party challenged the constitutionality of a statute on Appointments Clause grounds.  Although one plaintiff alleged that it was being investigated by the challenged Board and sought to enjoin any future action by the Board, 537 F.3d at 670, the Court of Appeals viewed the case as one

that neither challenged the validity of any agency action nor was even collateral to such a challenge, *id.* at 671.

*Free Enterprise Fund* does not aid the plaintiff in this case because what Live365 proposes would further expand on the limited *Time Warner* exception and be a wholly unjustified inroad on the basic rule of *TRAC* and *Thunder Basin*. Live365's claim for a preliminary injunction is not independent of any administrative proceeding.  It is targeted directly at a precisely defined ongoing administrative proceeding, the *Webcaster III* proceeding, and, among other things, amounts to a request for an extension of time for a specific September 29, 2009, deadline imposed by a specific, June 24, 2009, order in that proceeding.[2]

The Court of Appeals will have exclusive jurisdiction over an appeal from a final decision in *Webcaster III*.  There is no basis for Live365's request that a different court immerse itself in deciding the order and timing of proceedings in *Webcaster III*.

---

[2]  This case differs from *Free Enterprise Fund* in another respect.  The judicial review provision that applies here not only seeks to streamline judicial review by providing for one-step review directly in a court of appeals but also specifies a <u>particular</u> court of appeals to hear all statutory license ratemaking appeals.  *Compare* 17 U.S.C. § 803(d) *with* 15 U.S.C. § 78y(a)(1) (judicial review in SEC cases in District of Columbia Circuit <u>or</u> circuit of petitioner's residence).  However, if Live365's jurisdictional theory were accepted, future litigants could do an end run around the geographical exclusivity of judicial review Congress thought important for statutory license ratemaking: if there is jurisdiction in a district court, then venue will be proper not only in this Court but also in the district in which the plaintiff resides, 28 U.S.C. § 1391(e), and appeals would then go to a different circuit, *see* 28 U.S.C. § 1294.

To be sure, there is not yet a final decision in *Webcaster III* for the Court of Appeals <u>to</u> review.  That is of no moment, since the point of *TRAC* was precisely that the exclusivity of the Court of Appeals' jurisdiction attaches to not-yet-completed actions to protect its future jurisdiction.  *TRAC*, 750 F.2d at 76–79.  Of course, the Court of Appeals will be "circumspect in exercising jurisdiction over interlocutory petitions" and "the threshold" for such interlocutory judicial review in the Court of Appeals "is a high one."  *Id*. at 79.[3]  Moreover, the Court of Appeals has already declined to answer the issue raised by Live365 prematurely "on the basis of hasty, inadequate, and untimely briefing."  *Intercollegiate Broad. Sys.*, 571 F.3d at 76.  The Court of Appeals' reluctance to be stampeded into premature decision on the basis of hasty briefing is not a good reason for instead deciding the issue on the accelerated schedule of a preliminary injunction.  And, that the <u>Court of Appeals</u> may have discretion to decide whether to reach the constitutional issue while the *Webcaster III* proceeding is pending or to await final decision is likewise not a justification for bringing the matter before the district court instead.  Though it would be extraordinary for the Court of Appeals to consider the merits of Live365's

---

[3]  By pointing out that the Court of Appeals is the correct forum for Live365's challenge to the *Webcaster III* proceeding to be raised and that the interlocutory status of that challenge does not <u>automatically</u> bar the Court of Appeals from jurisdiction, defendants do not assert that, if this case were to be refiled in or transferred to the proper forum, the Court of Appeals should decide the matter immediately rather than await review of a final decision.  Some of the balance of hardships issues that preclude a preliminary injunction would also be relevant to the Court of Appeals' consideration whether to take up the matter in advance of a final decision.

claim on an interlocutory petition, such a petition would at least be filed in the correct court. The preliminary injunction motion seeks a remedy that is no less discretionary and no less extraordinary, and does so in the wrong court.[4]

## II. LIVE365 DOES NOT MEET THE STANDARD FOR OBTAINING A PRELIMINARY INJUNCTION

Live365 seeks a preliminary injunction — "an extraordinary and drastic remedy [that] is never awarded as of right." *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008) (citations and internal quotations omitted). To succeed on its motion, Live365 must demonstrate:  (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in Live365' s favor; and (4) that an injunction is in the public interest. *Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 334 (D.D.C. 2009) (citing *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374 (2008)). Live365 meets none of these requirements.

### A. Live365 Does Not Show A Likelihood Of Success On The Merits

The statutory method for appointing the Copyright Royalty Judges is consistent with the Appointments Clause because the Judges are at most inferior officers who are appointed by the Librarian of Congress, a head of a department

---

[4] That this case raises a "difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction" since "[i]t says nothing about the 'likelihood of success on the merits' other than making such success more *unlikely* due to potential impediments to even reaching the merits." *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008) (emphasis original).

within the meaning of the Appointments Clause.[5]  The Appointments Clause
provides:

> [The President] shall nominate, and by and with the
> Advice and Consent of the Senate, shall appoint Ambas-
> sadors, other public Ministers and Consuls, Judges of the
> supreme Court, and all other Officers of the United
> States, whose Appointments are not herein otherwise pro-
> vided for, and which shall be established by Law: but the
> Congress may by Law vest the Appointment of such infer-
> ior Officers, as they think proper, in the President alone,
> in the Courts of Law, or in the Heads of Departments.

U.S. Const., art. II, § 2, cl. 2.

Live365 contends that Copyright Royalty Judges are principal officers who
must be appointed directly by the President.  In moving for a preliminary
injunction, Live365 relies heavily on a recent concurring opinion by Judge
Kavanaugh suggesting that the appointment of Copyright Royalty Judges by the
Librarian of Congress is open to constitutional question, *SoundExchange, Inc. v.
Librarian of Congress*, 571 F.3d 1220, 1226 (D.C. Cir. 2009).  Judge Kavanaugh's
opinion was not joined by the two other Circuit judges to consider the issue,[6] was

---

[5]  We assume arguendo that the Copyright Royalty Judges are "Officers of the
United States," as opposed to mere employees.  If they were only employees, their
appointments would plainly be constitutional.  *See Freytag v. Commissioner*, 501
U.S. 868, 880 (1991).

[6]  Judge Kavanaugh was also in the minority in considering members of the
Public Company Accounting Oversight Board ("PCAOB") to be principal officers
rather than inferior officers when the Circuit Court heard the recent challenge to
the PCAOB's structure.  The majority opinion held that PCAOB members are
inferior officers whose appointments by the Securities and Exchange Commission
do not violate the Appointments Clause.  *See Free Enterprise Fund*, 537 F.3d at
675–76; *cf. id.* at 685–715 (Kavanaugh, J., dissenting).

made without the benefit of briefing by any party in that case, and cannot be relied upon as authority that there is a "likelihood of success on the merits." *Cf.* Pl. Mem. 10.  As the Supreme Court has recently emphasized, to obtain a preliminary injunction, Live365 must show that it is "likely to succeed on the merits" of its Appointments Clause challenge.  *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374 (2008) (emphasis added).  Live365 does not carry that burden.  A "serious constitutional issue," *SoundExchange,* 571 F.3d at 1226, does not a likelihood of success make.  Judge Kavanaugh's suggestion that the Judges "appear to be" principal officers, *see id.*, is not supported by the relevant Supreme Court precedents.  Copyright Royalty Judges are not principal officers.  And because they are appropriately appointed by the Librarian of Congress, who in turn is appointed by the President with the advice and consent of the Senate, Live365 is not likely to succeed on the merits of its claim.

## 1.   The Copyright Royalty Judges Are, At Most, Inferior Officers, Not Principal Officers, Under The Appointments Clause

Not all federal officials are "officers" in the constitutional sense, but those who are officers must be appointed in conformance with the Appointments Clause. *See* U.S. Const., art. II, § 2, cl. 2; *Buckley v. Valeo*, 424 U.S. 1, 125–26 (1976) (per curiam).  The Appointments Clause divides all "officers of the United States" into two categories: principal officers and inferior officers.  U.S. Const., art. II, § 2, cl. 2; *see also United States v. Germaine*,  99 U.S. 508, 509 (1878).  Principal officers must be appointed through nomination by the President with the advice and consent of

the Senate.  U.S. Const., art. II, § 2, cl. 2; *Buckley*, 424 U.S. at 132.  However,

Congress is permitted to make inferior officers appointable by the President alone,

the Courts of Law, or Heads of Departments.  *Id.*

Live365 argues that Copyright Royalty Judges are principal officers because

of the amount of authority and independence granted to them by Congress.  But as

discussed herein, Copyright Royalty Judges are inferior officers if they are officers

at all.

Both principal and inferior officers "exercise . . . significant authority" on

behalf of the United States.  *Edmond*, 520 U.S. at 662.  Though there is not an

"exclusive criterion for distinguishing between principal and inferior officers for

Appointments Clause purposes," *Edmond*, 520 U.S. 661, the Supreme Court has

articulated the standard as follows:

> Generally speaking, the term "inferior officer" connotes a
> relationship with some higher ranking officer or officers
> below the President:  Whether one is an "inferior" officer
> depends on whether he has a superior. . . . [W]e think it
> evident that "inferior officers" are officers whose work is
> directed and supervised at some level by others who were
> appointed by Presidential nomination with the advice and
> consent of the Senate.

*Id.* at 662–63; *accord, e.g.*, *Free Enterprise Fund*, 537 F.3d at 672.  Applying this

standard, the Court held in *Edmond* that civilian judges appointed to the Coast

Guard Court of Appeals by the Secretary of Transportation were inferior officers

because their work was supervised "at some level" by the Judge Advocate General

(a subordinate to the Secretary of Transportation) and by the Court of Appeals for the Armed Forces (another Executive Branch entity).  *Id.* at 664.

According to Live365, the Copyright Royalty Judges "exercise expansive authority," Pl. Mem. 11, and have "broad discretion to conduct hearings, issue subpoenas, render decisions and impose regulations governing the rates and terms of the compulsory licenses that are binding on all applicable copyright owners and users."  Pl. Mem. 5.  Like the Coast Guard judges in *Edmond*, the Copyright Royalty Judges make findings of law and fact.  Yet the Coast Guard judges in *Edmond* were determined by the Supreme Court to be inferior officers despite wielding other more significant powers.  Among their responsibilities, the Coast Guard judges review "court-martial proceedings that result in the most serious sentences, including . . . death, dismissal, . . . dishonorable or bad-conduct discharge, or confinement for one year or more."  *Edmond*, 520 U.S. at 662 (internal citations removed).  Copyright Royalty Judges who set rates for statutory licenses do not have categorically more executive authority than Coast Guard judges who review death sentences — the "law's most severe penalty."  *See Roper v. Simmons*, 543 U.S. 551, 571 (2005).

Not everyone who "'take[s] testimony, conduct[s] trials, rule[s] on the admissibility of evidence, and ha[s] the power to enforce compliance with discovery orders,'" *Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125, 1134 (D.C. Cir. 2000) (quoting *Freytag v. Comm'r*, 501 U.S. 868, 881–82 (1991)), is even an "Officer of the United States," 204 F.3d at 1134.  Administrative Law Judges (ALJs), for example,

are "employees," not "officers." *Id.* On the other hand, special trial judges of the Tax Court who — like the Copyright Royalty Judges but unlike ALJs — issue final decisions in certain classes of cases, are considered to be inferior officers. *Id.*; *cf. Freytag*, 501 U.S. at 881.

The critical factor for determining an officer's status as inferior or principal is whether the officer is "supervised at some level" by other officers who are appointed directly by the President. *Edmond*, 520 U.S. at 663. Live365 attempts to minimize the extent to which Copyright Royalty Judges are supervised by asserting that the Librarian of Congress has no "effective oversight" or "day-to-day" control over the Judges. Pl. Mem. 5. But neither the Coast Guard judges in *Edmond*, 520 U.S. at 651, nor the Independent Counsel in *Morrison v. Olson*, 487 U.S. 654, 671 (1988), were subject to that level of day-to-day oversight, and the Supreme Court held the officers in both of those cases to be inferior officers. So too, the special trial judges in *Freytag* were inferior officers despite issuing final decisions and "exercis[ing] independent authority." 501 U.S. at 882.

Under *Edmond*, the Copyright Royalty Judges are inferior officers because their "work is directed and supervised at some level," indeed, in a meaningful way, by the Librarian of Congress, who was "appointed by Presidential nomination with the advice and consent of the Senate," *Edmond*, 520 U.S. at 663, and by the Register of Copyrights. The Judges are expressly required to "act in accordance with regulations issued by . . . the Librarian of Congress." 17 U.S.C. § 803(a)(1). Any procedural regulations issued by the Judges themselves, including rules

governing royalty ratemaking proceedings, must be approved by the Librarian.  *Id.*
§ 803(b)(6).  The Librarian is authorized to promulgate binding ethical rules and to
enforce those rules against the Judges.  *Id.* § 802(h), (i).  Indeed, the Judges lack
space or administrative resources of their own, and are wholly reliant on the
Librarian for support.  *Id.* § 801(d), (e).  And if the Judges are not otherwise
engaged between ratemaking proceedings, they may be assigned other duties at the
discretion of the Register of Copyrights, who likewise acts under the direction of the
Librarian.  *Id.* § 801(b)(8); *see* 17 U.S.C. § 701(a) (Register of Copyrights "shall act
under the Librarian's general direction and supervision").

Through the Register, the Librarian also has the authority to review and
correct the substantive determinations of the Copyright Royalty Judges.  In
creating the Judges, Congress reserved to the Register — and hence ultimately to
the Librarian — the authority to interpret the copyright laws.  The Copyright Act
accordingly directs the Judges to obtain a written opinion from the Register on all
novel and material questions of copyright law, and stipulates that the Judges "shall
apply" the Register's conclusions in their ratemaking determinations.  17 U.S.C.
§ 802(f)(1)(B).  Moreover, the Register has the power to "review for legal error" all
substantive determinations by the Copyright Royalty Judges and to "correct[]" any
errors in the Judges' reasoning or conclusions.  *Id.* § 802(f)(1)(D).  Such
"correct[ions]" are not only expressly made part of the record in the cases in which
they arise, but are also "binding as precedent" on the Judges in future cases.  *Id.*
Thus, the Copyright Royalty Judges "are officers whose work is directed and

supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663; *see also Free Enterprise Fund*, 537 F.3d at 672–73.

Finally, the Librarian has the authority to remove the Copyright Royalty Judges for misconduct or neglect of duty. 17 U.S.C. § 802(i). As the Supreme Court emphasized in *Edmond*, "[t]he power to remove officers . . . is a powerful tool for control." 520 U.S. at 664. Although the Judges may only be removed for cause, that was equally true of the Independent Counsel in *Morrison*, 487 U.S. at 663, and of the Board members in *Free Enterprise Fund*, 537 F.3d at 673–74. Nonetheless, the Supreme Court in *Morrison* and the Court of Appeals in *Free Enterprise Fund* stressed the importance of the removal power in concluding that the officials in those cases were inferior officers. *See* Morrison, 487 U.S. at 671; *Free Enterprise Fund*, 537 F.3d at 673–75.

> **2.    Copyright Royalty Judges Are Appointed By The Librarian of Congress — A Head Of A Department Within The Meaning Of The Appointments Clause**

Live365 argues in the alternative that Copyright Royalty Judges are inferior officers but that their appointment by the Librarian of Congress violates the Appointments Clause because the Librarian is not a "head of a department" within the meaning of the Constitution. Pl. Mem. 14–17. This argument is also wrong. The Librarian of Congress is a "head" of a "department" as those terms are defined for Appointments Clause purposes.

### a.    The Librarian Is A Principal Officer

The Librarian of Congress is "appointed by the President, by and with the advice and consent of the Senate." 2 U.S.C. § 136. No statute limits the President's oversight of the Librarian, nor has Congress reserved to itself the power to review or influence the Librarian's conduct in office. *Cf. Bowsher v. Synar*, 478 U.S. 714, 730-31 (1986). The Librarian "make[s] rules and regulations for the government of the Library," 2 U.S.C. § 136, and in discharging that responsibility he is account-able to the President alone, *cf. Edmond*, 520 U.S. at 662.

Nor are there any limitations on the President's power to remove the Librarian, which is an incident of the power of appointment. *Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 259 (1839); *Kalaris v. Donovan*, 697 F.2d 376, 389 (D.C. Cir. 1983). It has long been recognized that the Librarian is removable by the President at will. *See, e.g.*, 29 Cong. Rec. 378 (1896) (Rep. Bingham) ("President Cleveland today can by a mere stroke of his pen change or remove the Librarian of Congress for any cause or reason good to himself, or for a more efficient administration of the Library."). President Jackson in fact removed the Librarian of Congress after the Librarian publicly criticized President Jackson and his family. 29 Cong. Rec. 378 (1896). In turn, President Lincoln later removed the Librarian whom Jackson had appointed and replaced him with a Republican. *See About the Librarian, Previous Librarians of Congress, John Silva Meehan*, http://www.loc.gov/about/librarianoffice/meehan.html (last visited, Sept. 11, 2009).

Indeed, the President's power to appoint and remove the Librarian of Congress is as old as the Library itself.  The first Librarian was appointed by President Thomas Jefferson in 1802.  *See* Act of January 26, 1802, 2 Stat. 128.  The 1802 Act called for "a librarian to be appointed by the President of the United States solely, [to] take charge of the said library."  *Id.* § 3, 2 Stat. 129.  After Congress assigned to the Librarian responsibility for the administration of the federal copyright laws, *see* Copyright Act of 1870, § 85, 16 Stat. 212, Congress enacted additional legislation requiring Senate confirmation of the Librarian's appointment.  *See* Act of February 19, 1897, 29 Stat. 544.

As the historical record makes clear, Congress crafted the 1897 legislation specifically to satisfy the requirements of the Constitution.  Members of Congress debated the constitutional status of the Library, including explicit consideration of the Appointments Clause.  *See, e.g.*, 29 Cong. Rec. 315 (1896) (Rep. Quigg); *id.* at 319 (Rep. Dockery); *id.* at 386 (Rep. Cannon).  Some proposed that the Library should be under the control of Congress, with its employees appointed by congressional committees.  *E.g.*, 29 Cong. Rec. 385 (Rep. Cummings).  Others insisted that "with respect to an office of this kind," Congress "should not depart from the constitutional provision that the President shall nominate and by and with the advice and consent of the Senate appoint."  *Id.* at 389 (Rep. Richardson).

The latter view prevailed.  Congress in the 1897 Act expressly acknowledged the Librarian's executive functions, *see* 29 Stat. 545 (appropriating funds for activities "under the direction of the Librarian of Congress, necessary for the

execution of the copyright law"), and accordingly directed that the Librarian shall

"be appointed by the President, by and with the advice and consent of the Senate,"

29 Stat. 544.  The implications of this decision were not lost on Congress.  One

opponent of the 1897 legislation warned:  "By this bill, when enacted into law,

Congress forever puts it out of their power to control the Library.  It now loses its

name and function of a Congressional Library, and becomes a national or

Presidential Library, beyond the control of Congress, except by the President's

consent."  29 Cong. Rec. 977 (1897) (Sen. Call).  The 1897 statute, now codified at 2

U.S.C. § 136, reflects Congress's recognition that the Library is not, in the eyes of

the Constitution, an organ of Congress itself.  Rather, it is an executive department

led by a principal officer who "exercis[es] significant authority pursuant to the laws

of the United States," *Buckley*, 424 U.S. at 126, and must therefore be appointed in

conformity with the Appointments Clause.

> **b.    The Library Is An Executive Department
> For Appointments Clause Purposes**

Congress's deliberate choice to vest the appointment of the Librarian in the

President, subject to confirmation by the Senate, leaves little doubt as to the

constitutional status of the Library itself.  At the time of the framing, the term

"department" referred to a "'separate allotment or part of business; a distinct

province, in which a class of duties are allotted to a particular person.'"  *Freytag*,

501 U.S. at 920 (Scalia, J., concurring in part and concurring in the judgment)

(quoting 1 N. Webster, *American Dictionary* 58 (1828)).  As used in the Appoint-

ments Clause, the term "has reference to the subdivision of the power of the Executive into departments, for the more convenient exercise of that power." *Germaine*, 99 U.S. at 510; *see Buckley*, 424 U.S. at 127 ("Departments" in the Appointments Clause "are themselves in the Executive Branch or at least have some connection with that branch").

The Library possesses all of the features that traditionally distinguish the executive departments. It is a free-standing entity, not contained within any other administrative agency. It performs executive functions, including in particular the administration of the copyright laws — and has been accorded deference from the courts for its interpretations of those laws. *E.g.*, *Mazer v. Stein*, 347 U.S. 201, 211–13 (1954); *Cablevision Systems Dev. Co. v. Motion Picture Ass'n of America, Inc.*, 836 F.2d 599, 608–10 (D.C. Cir. 1988) (Copyright Office regulations are entitled to *Chevron* deference). And most importantly, the Library is headed by a principal "Officer[] of the United States" who is appointed by the President and removable at his will. The Library is accordingly "subject to the exercise of political oversight and share[s] the President's accountability to the people." *Freytag*, 501 U.S. at 886.

In urging that the Library is nonetheless not a "department," Live365 relies on the Supreme Court's decision in *Freytag*. Pl. Mem. 16. But neither the Court's holding nor its reasoning supports that contention. The Court in *Freytag* refused to hold that the term "department" is limited to the Cabinet agencies, and it expressly reserved the question whether the heads of non-Cabinet "principal agencies" may

appoint inferior officers.  501 U.S. at 886–87 & n.4.  Moreover, as Justice Scalia

explained for four concurring justices in *Freytag*, it would be a "most implausible

disposition" to hold that a principal agency like the Library is not a "department"

under the Appointments Clause.  501 U.S. at 919–20 (Scalia, J., concurring in part

and concurring in judgment).  Under such a regime, the Librarian would lack the

authority to appoint not only the Copyright Royalty Judges, but <u>any</u> inferior officers

within the Library.  These officers would instead have to be appointed "by the

President, the courts of law, or the 'Secretary of Something Else.'"  *Id.*  Such a result

would make little sense, and the Constitution does not require it.  Indeed, the Court

of Appeals has squarely held that "the Heads of Departments" within the meaning

of the Appointments Clause are not limited to departments headed by Cabinet

members.  *Free Enter. Fund*, 571 F.3d at 676–78 (SEC commissioners are the head

of a department); *see also Silver v. United States Postal Service*, 951 F.2d 1033, 1038

(9th Cir. 1991) (nine governors of Postal Service constituted its "Head[ ]").

Certainly the congressional sponsors of the 1897 legislation believed the

Library to be a "department" under the Constitution.  As one member argued:  "This

Library of Congress is a department of the Government.  It is an executive

department and should be under the control of the executive branch. . . .  [It] is an

executive bureau, and as such should be presided over by some executive officer

with authority to appoint and remove its employees."  29 Cong. Rec. 318–19 (1896)

(Rep. Dockery).  Another member urged rejection of a proposal for Congress to take

control of the Library, explaining:  "[W]e have various Departments of the

Government.  The Presidents and the heads of these Departments make appointments of subordinates.  Their action is reported to Congress.  We haul them up, 'drag them over the coals,' if they fail to perform their duty.  We have the powers of impeachment; we criticize and investigate.  And that is as it ought to be." *Id.* at 386 (Rep. Cannon).

The Fourth Circuit thus held, in the only appellate decision to address the constitutional status of the Library of Congress, that Congress did not violate the Appointments Clause by vesting the Librarian with the power to appoint the Register of Copyrights.  *Eltra Corp. v. Ringer*, 579 F.2d 294, 298–301 (4th Cir. 1978).  The panel unanimously concluded that the Librarian's appointment of the Register satisfies the Constitution because "the Copyright Office is an executive office, operating under the direction of an Officer of the United States and as such is operating in conformity with the Appointments Clause."  *Id.*  The same is true of the Copyright Royalty Judges.

### c.    Live365 Mistakes Statutory Labels For Constitutional Authority

The gravamen of Live365's argument is that the Library of Congress cannot be a "department" under the Constitution because the Library is "not in the Executive Branch."  Pl. Mem. 16.  That contention is wrong.  It is the President, not Congress or any congressional agent, who appoints the principal officer of the Library, and the President may remove him at will.  2 U.S.C. § 136.  Live365 makes

no attempt to reconcile its argument with this provision, nor with the two-hundred-year history of the Librarian's accountability to the President.

Notwithstanding its name, the Library of Congress is not uniquely "legislative" in the <u>constitutional</u> sense.  The Library was originally established to hold Congress's books.  *See* Act of January 26, 1802, § 1, 2 Stat. 128–129.  Even in that first Act, however, Congress provided for appointment of the Librarian by the President, and authorized the President and Vice President to borrow books.  *Id.* §§ 3, 4, 2 Stat. 129.  Thereafter, Congress assigned the Librarian principal responsibility in the federal government for the administration of the copyright laws.  *See* 16 Stat. 212 (1870).  Congress also directed the Library to serve the Judicial Branch.  2 U.S.C. § 137 (power of Supreme Court justices to issue regulations for the use of the Library's law department); *id.* § 137c (right of judges of the D.C. Circuit and of this Court to withdraw books).  Furthermore, Congress has charged the Library with public archival and preservation functions similar to those of the National Archives, an executive agency.  *Compare* 2 U.S.C. § 179p (national film registry collection); *id.* § 1711 (national sound-recording preservation program), *with* 44 U.S.C. § 2114 (preservation of films and sound recordings by the Archivist).  Thus, as Congress recognized in 1897 when it conformed the Librarian's appointment to the requirements of the Appointments Clause, "it is a misnomer to call it the Congressional Library.  It is a great national Library and belongs to the Government of the United States."  29 Cong. Rec. 318–19 (1896) (Rep. Dockery); *accord id.* at 387 (Rep. Stone); *ibid.* (Rep. Fairchild).

-29-

Live365 stresses that the provisions creating the Library are codified in Title 2 of the United States Code.  Pl. Mem. 16.[7]  But, as the Fourth Circuit recognized in *Eltra*, such <u>statutory</u> labels do not determine the status of the Library under the *Constitution.  See Eltra,* 579 F.2d at 301 ("It is irrelevant that the Office of the Librarian of Congress is codified under the legislative branch or that it receives its appropriation as a part of the legislative appropriation.").  If codification in Title 2 alone were determinative, the Supreme Court's opinion in *Buckley* would have been much shorter:  the Federal Election Commission was codified in the legislative branch.  424 U.S. at 144.  Indeed, on this theory, the FEC would <u>still</u> be unconstitutional today, because the amended provisions creating the agency remain in Title 2.  2 U.S.C. §§ 431 *et seq.*; *see Eltra*, 579 F.2d at 301.

The Library's classification as a legislative entity for various statutory purposes, such as the Administrative Procedure Act ("APA") and the Freedom of Information Act (*see, e.g.,Washington Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994) (Library exempt from the APA as legislative entity)), likewise does not determine whether the Library is an executive agency for constitutional purposes.  Just as Congress can define the "government" for statutory

---

[7]  In *Keeffe v. Library of Congress*, 777 F.2d 1573, 1574 (D.C. Cir. 1985), a First Amendment case, the D.C. Circuit referred to the Library in dicta as a "congressional agency."  The court cited 2 U.S.C. § 171(1), which states that Congress in 1800 "established for itself a library."  As already discussed, however, the Librarian from the outset has been a Presidential appointee, and in 1897 Congress removed any doubt that the Library is, for <u>constitutional</u> purposes, an executive department.  *See* 29 Stat. 544.

purposes but not constitutional ones, *see Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995), and just as Congress's definition of "executive departments" in 5 U.S.C. § 101 does not limit the term "department" in Article II, *see Freytag*, 501 U.S. at 886–87 & n.4, statutory classifications of this kind do not impede the Librarian's exercise of executive power under the Constitution.  What matters is that the Librarian is accountable only to the President and is appointed in conformity with the Appointments Clause.  *See Buckley*, 424 U.S. at 128 n.165 (an officer appointed by and accountable to the President is an executive officer under the Constitution "irrespective of Congress' designation" to the contrary).

In arguing that Copyright Royalty Judges are principal officers, Live365 claims that "it is telling" that the Judges are similar to members of the Copyright Royalty Tribunal ("CRT"), a predecessor royalty-setting agency established by the Copyright Act of 1976, which provided for appointment of the members by the President with confirmation by the Senate.  Pl. Mem. 14.  The only thing "telling" about that contention is how it reflects on Live365' s own arguments.  The 1976 Act established the CRT as an agency "in the legislative branch."  Pub. L. No. 94-553, § 801, 90 Stat. 2541, 2594 (1976).  If Live365' s arguments here that the labels control were correct, that statutory label by itself would have rendered the CRT invalid, even though its members plainly were appointed in conformity with the Appointments Clause.

More fundamentally, the CRT was a free-standing administrative agency, not subject to supervision by the Librarian or any other principal officer.  *See id.*

Appointment by the President was therefore constitutionally required. Congress could have established the Copyright Royalty Judges on the same model. Instead, it opted to make the Judges inferior officers appointed by the Librarian, the "head" of the Library, who in turn is subject to plenary oversight by the President. That is exactly the sort of choice that the Appointments Clause permits Congress to make.

### B.   Live365 Is Not Likely To Sustain Irreparable Harm That A Preliminary Injunction Would Avoid

A plaintiff seeking the extraordinary remedy of a preliminary injunction is "require[d] . . . to demonstrate that irreparable injury is *likely* in the absence of an injunction," not just that irreparable harm is merely "possib[le]." *Winter v. Natural Resources Defense Council*, 129 S. Ct. 365, 375 (2008) (emphasis original); *accord*, *e.g.*, *Bill Barrett Corp. v. Dep't of Interior*, 601 F. Supp. 2d 331, 334 (D.D.C. 2009). Live365 asserts that "relief may be afforded where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable harm," Pl. Mem. 9–10, but the cases cited by Live365 pre-date *Winter*. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (Kavanaugh, J., joined by Henderson, J., concurring) ("this Circuit's traditional sliding scale approach to preliminary injunctions may be difficult to square with" *Winter*). The Supreme Court has now made it clear that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy

that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 129 S. Ct. at 375–76.

Live365 fails to show that significant irreparable harm is even plausible, much less likely.  Live365 argues that it will sustain irreparable harm because the efforts and money it will allegedly have to spend if it chooses to continue participating in *Webcaster III* will go to waste if the judges' appointments are found invalid only after the proceeding has been conducted.  As we explain below, that is not likely.  Part II.B.2, *infra*.  More fundamentally, however, even if this premise of Live365's argument were correct, the Supreme Court has squarely foreclosed the conclusion Live365 would derive from that premise as a matter of law.

> **1.  Even If Live365 Were To Incur Unrecoupable Litigation Expenses As A Result Of Its Decision To Participate in *Webcaster III*, As A Matter Of Law Unrecoupable Litigation Expense Is Not <u>Irreparable Injury</u>**

As a matter of law, litigation expense, even where there is no means to recoup the costs following a final judgment, does not constitute irreparable injury. In no uncertain terms, the Supreme Court has explained:

> [The plaintiff] argues that the expense and disruption of defending itself in protracted adjudicatory proceedings constitutes irreparable harm.  As indicated above, we do not doubt that the burden of defending this [administrative] proceeding will be substantial.  But "the expense and annoyance of litigation is 'part of the social burden of living under government.'" *Petroleum Exploration, Inc. v. Public Service Comm'n*, 304 U.S. 209, 222 (1938).  As we recently reiterated: "Mere <u>litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury</u>." *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974).

*Federal Trade Commission v. Standard Oil Co.*, 449 U.S. 232, 244 (1980) (emphasis added).  That holding squarely forecloses Live365's claim of irreparable injury.

Although *Standard Oil* is the leading case addressing the central argument plaintiff makes, that unrecoupable litigation expense is irreparable harm, Live365 does not even cite the Supreme Court's decision.[8]  The cases Live365 instead relies on for the proposition that "such irrecoverable expenses constitute irreparable harm," Pl. Mem. at 19, do not even address whether litigation expenses, irrecoverable or otherwise, can constitute irreparable harm.  In this Court's decision in *Feinerman v. Bernardi*, 558 F. Supp. 2d 36 (D.D.C. 2008), for example, the irreparable harm was not the expense of participating in proceedings before the agency, but the loss of income to one plaintiff caused by the substantive order that resulted from the completion of those proceedings.  *See* 558 F. Supp. 2d at 50–51. The remaining cases cited in support of this point by Live365, Pl. Mem. at 19–20, likewise deal with harm resulting from the substance of government action rather than the litigation expense of participation in ongoing proceedings.

Live365 also essays a preliminary two-sentence argument that "many courts have found that no further showing of irreparable injury is necessary" if "a constitutional right is involved."  Pl. Mem. at 17.  The Supreme Court is not one of those "many courts."

---

[8]  Live365 cites an earlier and more obscure district court decision concerning the same Federal Trade Commission proceeding against Standard Oil that the Supreme Court would later address.  Pl. Mem. at 21, *citing Standard Oil Co. v. FTC*, 475 F. Supp. 1261 (N.D. Ind. 1979).

*Winter v. Natural Resources Defense Council*, 129 S. Ct. 365 (2008), put to rest any doubt that, outside special contexts not present here (such as Establishment Clause claims), a claim of constitutional violation does not automatically allow a plaintiff seeking a preliminary injunction to bypass the irreparable harm inquiry.  Two of the cases cited by *Winter* for the proposition that plaintiffs must show that irreparable harm is likely in order to obtain a preliminary injunction (129 S. Ct. at 375) were themselves cases that <u>were</u> based on the Constitution  in which the Supreme Court had found no irreparable harm.  In *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), plaintiff alleged violations of First, Fourth, Fifth, and Fourteenth Amendment rights, 461 U.S. at 98, and the Court nevertheless held that the plaintiff had not shown irreparable injury.  *Id.* at 111. Similarly, in *O'Shea v. Littleton*, 414 U.S. 488 (1974), the Supreme Court found no irreparable injury, *id.* at 502, even though the claim on the merits was that no fewer than five constitutional amendments were being violated, *id.* at 490.  *Winter* reconfirms that these cases remain good law and that there is thus no general rule that anyone asserting a constitutional basis for a merits claim has automatically demonstrated irreparable injury.

These principles apply with full force in cases such as this one where a party is attempting to short-circuit an ongoing administrative proceeding rather than waiting to seek relief in the proper forum following final agency action.  The claims in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), included constitutional claims, but that did not prevent the Court from finding that making the plaintiff

wait until the conclusion of the proceedings to obtain judicial review would not constitute irreparable harm.  510 U.S. at 216.

Even the specific reasoning of the case on which Live365 principally relies, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006), undermines the more general point Live365 attempts to infer.  The Court of Appeals found that an <u>Establishment Clause</u> violation constituted *per se* irreparable injury, but reached that conclusion only after an extensive analysis focused on the particular nature of the injuries necessarily attendant to Establishment Clause violations.  454 F.3d at 298–304.  That discussion would have been wholly unnecessary under Live365's theory that <u>any</u> constitutional claim automatically constitutes irreparable injury.

With respect to the <u>Appointments Clause</u>, the Court of Appeals has already rejected a claim that the expense of being forced to participate in proceedings allegedly tainted by an Appointments Clause violation constitutes irreparable harm when, as here, review of the Appointments Clause issue will be available following a final decision.  *Deaver v. Seymour*, 822 F.2d 66, 68–70 (D.C. Cir. 1987) (specifically distinguishing First Amendment cases); *see id*. at 72–73 (D.H. Ginsburg, J., concurring) (reading court's opinion as turning on lack of irreparable harm and concurring on that basis).  If there is a distinction between *Deaver* and this case, it cuts against Live365.  Deaver was a criminal defendant who, unlike Live365, was not participating in the underlying proceedings as a matter of choice and who had more than mere litigation expense at stake.  Even so, the Court of Appeals found

-36-

that he would not be irreparably harmed by raising the issue in the ordinary course of the proceedings and on direct appeal.

### 2. Live365 Does Not Demonstrate That A Preliminary Injunction Would Likely Save Live365 From Incurring Otherwise Wasted Litigation Costs

All that need be said to rebut Live365's claim of irreparable harm is that *Standard Oil* forecloses any claim that incurring irrecoverable litigation expenses, even in cases that involve protracted proceedings, constitutes irreparable harm.

But even if *Standard Oil* did not foreclose Live365' s irreparable harm contentions, those contentions simply do not make sense on a basic practical level. Plaintiff's declarant, N. Mark Lam, asserts that "[t]he preparation of the case" in *Webcaster III* will be "an intricate and time-consuming process." Lam Decl. ¶ 6. The filings due September 29, 2009, in particular are "not ordinary briefs" and will require "extensive filings." *Id*. "Most significantly," to support its September 29 briefing, Live365 must "locate and retain expert witness(es) to support its economic theories." *Id*.

If all that be so, of what possible <u>practical</u> value is a preliminary injunction that Live365 did not even seek until September had begun? Live365 could not possibly be relying on knowing well in advance of the September 29 deadline whether a preliminary injunction would be granted by this Court and sustained on appeal (or denied by this Court and granted on appeal). This Court does not ordinarily deal with copyright royalty proceedings, so it could not be counted upon for an immediate ruling in an unfamiliar area of law. And, though the Court of

Appeals is familiar with the work of the Copyright Royalty Judges, it has <u>already</u> indicated that it is <u>not</u> inclined to rule on the merits issue on the basis of "hasty" briefing. *Intercollegiate Broad. Sys.*, 571 F.3d at 76.  Under these circumstances, it will be <u>at best</u> only a few days before September 29 that Live365 will learn whether it does or does not have a preliminary injunction after consideration by this Court and the Court of Appeals.  By then, the "intricate" and "time-consuming" process described by Lam will have had to have been largely completed if it is to be done on time at all.  To consider just Lam's one "most significant[ ]" example: If Live365 has not <u>already</u> "locate[d]" its expert witnesses long before it learns the fate of its motion, it will be well past too late to start looking.

What the Lam declaration <u>does not say</u> is therefore more important than what it does say: <u>It does not say</u> that the extensive work that must be completed before September 29 is not <u>already</u> largely underway and does not represent that Live365 is awaiting the Court of Appeals' ruling on any preliminary injunction appeal (or even merely awaiting this Court's ruling) before deciding whether to work on a massive September 29 submission.  If much of the work for the herculean tasks Lam outlines has already been undertaken, then a preliminary injunction simply could not achieve its supposed purpose of making that work unnecessary.

To the extent Live365 is looking to avoid the litigation tasks that will extend beyond the September 29 submission of opening briefs, the "costs of a year or more in such litigation," Pl. Mem. at 19, its argument that it is faced with irreparable harm collides with its own argument that defendants and the other parties in

*Webcaster III* proceeding will not be harmed.  When it claims that the other parties will not be harmed much, Live365 seems to argue and expect that, one way or another, this litigation will be over by, and will push the September 29 deadline to, October 24.  Pl. Mem. at 20–21.  That seems too optimistic, at least for final appellate resolution of this case.  But if consideration of costs beyond the next month or so might therefore be appropriate, one must look at <u>both</u> sides of the balance of hardships.

On Live365's side, even if one does consider the litigation expense that Live365 will incur beyond September 29 and beyond October 24, Live365's view that the efforts of the parties to the proceeding will be wasted if the Appointments Clause argument is ultimately sustained is unconvincing.  Much of that work will be the attorneys' development of their cases, the exchange of documents, the experts' analyses of the issues, the witnesses' crafting of their statements, and the parties' taking of depositions.  The attorneys, photocopiers, experts, witnesses, and court reporters do not need to be appointed by the President.  Even if it were ultimately found that the judges are improperly appointed, that would not require that the briefs, documents, expert reports, witness statements, and deposition transcripts be thrown away.  Nor will testimony before the judges necessarily become wasted effort if their appointments are struck down.  Someone else could be properly appointed to make a decision (perhaps some or all of the same judges), and, if so, Congress could certainly choose to provide that those new decisionmakers could make use of the previously developed record in reaching a decision.  *Cf.* Fed.

R. Civ. P. 63 (in event federal judge becomes unable to proceed, record developed before the court may continue to be used in further proceedings before another judge).  Thus, even if Live365's Appointments Clause challenge were ultimately sustained, it simply does not follow that the efforts Live365 and other parties will devote to the *Webcaster III* proceedings will have been wasted.  An injunction to avoid that supposed waste is unnecessary.

### C.   The Balance Of Equities Does Not Tip In Live365's Favor And An Injunction Would Be Contrary To The Public Interest

Defendants, the other participants in the *Webcaster III* proceedings, and the public interest will all be harmed if a preliminary injunction is entered.

As Live365's own declarant admits, the *Webcaster III* proceedings that Live365 asks to have delayed will be a massive undertaking, involving "attorneys on all sides exchanging reams of documents," followed by "many depositions" in "multiple cities," and then live testimony that, in the *Webcaster II* proceedings, consumed forty-eight days.  Lam Declaration at 3.  Following all that, the judges must reach a decision on these complicated issues.  As Live365 also concedes, Congress has required that all this work be finished by December 16, 2010.  Pl. Mem. at 21, *citing* 17 U.S.C. § 803(c).

Live365 nevertheless suggests that neither the defendants, nor the other parties in the *Webcaster III* proceedings, nor the public interest will be harmed if the work needed to reach a decision by the statutory deadline is put on hold while this Court and (as is likely) the Court of Appeals first consider the Appointments

Clause issue.  In part, Live365's argument seems based on a supposition that a preliminary injunction in this case will be of relatively short duration because the case will, one way or another, be concluded by October 24, which means that, even if a preliminary injunction were wrongly entered, it would be vacated by October 24, allegedly leaving the participants in *Webcaster III* with time to complete the proceedings by the statutory deadline.  Pl. Mem. at 20–21.  But, particularly in the face of the view already expressed by the Court of Appeals that it was not inclined to consider the Appointments Clause issue on the basis of "hasty, inadequate, and untimely briefing," *Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 571 F.3d 69, 76 (D.C. Cir. 2009), Live365's apparent notion that the entire case will be completed by October 24 (Pl. Mem. at 20–21) is likely to be overly optimistic.

The longer any preliminary injunction would remain in effect before being lifted, the more compressed the work of the parties and judges in *Webcaster III* would have to become.  December 16, 2010, may sound like a long way off, but to attorneys and parties who must exchange discovery, prepare for, schedule, and take many depositions in a multiple-party case, and then prepare for and participate in a multi-week hearing, and for judges who must reach a decision following that hearing, the schedule does not contain much slack.  Those attorneys (and the experts, witnesses, and parties) and judges will be harmed if they are forbidden from even beginning their work during however many months Live365 needs for consideration of its Appointments Clause claim, and then – when the preliminary injunction expires – find that they have to do the work of fifteen months in however

-41-

few months are left.  For Live365 to suggest that this compression of the schedule is of little or no moment to defendants or to the other parties in *Webcaster III* requires Live365 to disbelieve or disregard its own declarant's factual recital of how much complicated and time-consuming work must be accomplished by the participants in *Webcaster III* over the next fifteen months.

Perhaps recognizing this reality, Live365 also argues (Pl. Mem. at 21) that even if its requested injunction does cause the setting of new royalty rates to be delayed beyond the deadline mandated by Congress, the "artists will suffer no harm" because they will receive royalties under the new rates retroactive to the date when they should have been set.[9]  But Congress "set forth specific time periods for the various procedural and substantive steps participants must complete throughout a ratesetting or distribution proceeding" in order to have new rates in place by the time old ones expire.  H.R. Rep. No. 108-408, at 34.  Moreover, in light of the "immense workloads" on the judges, Congress deliberately "stagger[ed]" the periods in which different license proceedings are addressed to "ensure that distribution and rate-making proceedings are conducted in a timely fashion."  *Id.* at 39.  The public interest is best served by the detailed and interlocking timetable

---

[9]  The possibility that artists could receive on a retroactive basis payments that Live365's proposed injunction will have delayed will be cold comfort if, in the meantime, Live365 becomes insolvent.  In that regard it is particularly troubling that, despite the clear command of Fed. R. Civ. P. Rule 65(c) that a preliminary injunction be issued "only if the movant gives security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," Live365's proposed order would grant the preliminary injunction <u>without</u> requiring a bond in <u>any</u> amount.

Congress so carefully laid out, rather than by the *ad hoc* scrambling that Live365 thinks might work instead.  As the Supreme Court has recently emphasized, notwithstanding a "blithe assertion of an 'absence of any injury to the public interest,'" the public interest is harmed when an injunction "undermines" the specific procedures that <u>Congress</u> has established to achieve "prompt" resolution of disputes.  *Nken v. Holder*, 129 S. Ct. 1749, 1762 (2009).

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss should be granted and plaintiff's motion for preliminary injunction should be denied.


Dated:  September 14, 2009                    Respectfully submitted,

                                              TONY WEST
                                              Assistant Attorney General

                                              CHANNING D. PHILLIPS
                                              Acting United States Attorney

                                              SUSAN K. RUDY
                                              Assistant Director
                                              Federal Programs Branch

/s/ *Brian G. Kennedy*

ELIZABETH A. PUGH
General Counsel
Library of Congress
LM 601 - Madison Building
101 Independence Ave.
Washington, DC  20540
Phone: (202) 707-2257

BRIAN G. KENNEDY
    (DC Bar No. 228726)
LISA ZEIDNER MARCUS
    (NY Bar No. 4461679)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, D.C.  20530
Telephone:  (202) 514-3357
Fax:  (202) 616-8470
Email: brian.kennedy@usdoj.gov

Attorneys for Defendants