## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LIVE365, INC.,                             )<br>                                            )<br>                    Plaintiff,             )<br>                                            )<br>           v.                               )<br>                                            )<br>COPYRIGHT ROYALTY BOARD;                    )<br>JAMES H. BILLINGTON, in his official        )<br>capacity as Librarian of Congress; and      )<br>JAMES SCOTT SLEDGE, STANLEY C.              )<br>WISNIEWSKI, and WILLIAM J.                  )<br>ROBERTS, in their official capacities        )<br>as Judges of the Copyright Royalty Board,    )<br>                                            )<br>                    Defendants.             )<br>                                            ) | Civil Action No. 09-01662  (RBW) |

## MEMORANDUM OPINION

This case was initiated by Live365 on August 31, 2009, seeking declaratory and injunctive relief through a facial challenge under the Appointments Clause of the Constitution against the Copyright Royalty Board ("CR Board" or "Board"),[1] the judges of the Board in their official capacities, as well as the Librarian of Congress (collectively referred to hereafter sometimes as "the government" or "the defendants"). Specifically, the plaintiff challenges the creation of the CR Board as promulgated by "a 2004 amendment to the U.S. Copyright Act, 17 U.S.C. § 801." Complaint ("Compl.") ¶ 1. On September 2, 2009, the plaintiff filed a motion for a preliminary injunction asking the Court to "stay[] [a] pending CR[ Board] proceeding—In the Matter of Digital Performance Right in Sound Recordings and Ephemeral Recordings, Docket No. 2009-1(CRB Webcasting III)—until Live365's Appointments Clause challenge to the CR[ Board]'s makeup . . . can be resolved." Plaintiff Live365, Inc.'s Motion/Application for

---

[1] "The Copyright Royalty Board is the institutional entity in the Library of Congress that . . . house[s] the Copyright Royalty Judges, appointed pursuant to 17 U.S.C. [§] 801(a), and their staff." Copyright Royalty Board, 37 C.F.R. § 301.1 (2010).

Preliminary Injunction at 1.   The government filed its opposition to the motion on September

14, 2009, along with filing its own Motion to Dismiss for Lack of Subject Matter Jurisdiction.

Defendants' Motion to Dismiss ("Defs.' Mot.").   Also on September 14, SoundExchange, Inc.

("SoundExchange") filed its motion to "intervene as of right as a defendant to protect its interest

in this litigation,"[2] SoundExchange's Motion for Leave to Intervene at 1, which was granted by

the Court on September 18, 2009.   As a result of these filings, the Court convened a hearing on

September 22, 2009, and the matter was taken under advisement by the Court at the conclusion

of the hearing.   For the reasons that follow, both the plaintiff's Motion for Preliminary Injunction

and the defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction are denied.

### I.  Background

A.     Facts of the Case[3]

   1.     The Copyright Royalty Board

    In 2004, Congress created the CR Board through the enactment of the Copyright Royalty

and Distribution Reform Act of 2004, Pub. L. 108-419, 118 Stat. 2341, which amended the

Copyright Act, 17 U.S.C. § 801 (2006) ("Copyright Act").   The CR Board is comprised of three

judges who serve staggered, six-year terms, and once appointed they may be removed only for

"misconduct, neglect of duty, or any disqualifying physical or mental disability."   17 U.S.C. §§

802(c), (I) (2006).   The appointment authority of these judges is vested in the Librarian of

Congress ("Librarian"), who appoints the judges after consultation with the Register of

Copyrights ("Register"), also an appointee of the Librarian.   17 U.S.C. § 801(a).   The current

judges were appointed in January 2006.   72 Fed. Reg. 24,084 (May 1, 2007).

---

[2] SoundExchange is a "not-for-profit organization that represents the interests of the recipients of the royalties set by the [CR Board]."   SoundExchange's Memorandum of Points and Authorities in Support of Its Motion for Leave to Intervene as a Defendant at 2.

[3] The following facts are either not in dispute or are matters of public record.

The CR Board judges are responsible, inter alia,

[for setting] rates and terms that webcasters and other services pay to copyright owners and performers for the use of copyrighted sound recordings under a statutory compulsory license[, which] grant[s] eligible services a license to digitally stream copyrighted sound recordings, and grant[s] copyright owners and performers a right to be paid a royalty by the services for their use of sound recordings.

SoundExchange's Memorandum of Points and Authorities in Support of Its Motion for Leave to Intervene as a Defendant at 2 (citing 17 U.S.C. §§ 112, 114 (2006)).  In performing their duties, the CR Board has broad discretion to commence hearings, 17 U.S.C. § 803(b)(1)(A)(I) (2006), issue subpoenas, id. § 803(b)(6)(C)(ix), render decisions, id. § 803(c)(1), grant protective orders, id. § 803(c)(5) and impose regulations governing the rates and terms of copyright royalties, id. § 802(f)(1)(A)(i).  However, all regulations issued by the CR Board judges are subject to approval by the Librarian, and the judges must act in accordance with the regulations issued by the Librarian.  Id. §§ 803(b)(6)(A), (a)(1). The CR Board judges are also required to seek and obtain a written opinion from the Register whenever a novel area of substantive law arises. Id. § 802(f)(1)(B).  Furthermore, their decisions are also subject to review for legal error by the Register, who may correct all errors they commit.  Id. § 802(f)(1)(D).  Finally, decisions made by the CR Board are appealable directly to the District of Columbia Circuit. Id. § 803(d)(1).

2.     The Webcasting III Proceeding

The CR Board judges are required by statute to convene every five years to determine the royalty rates webcasters are required to pay for the use of copyrighted works, id. § 803(b), and Live365 is a participant in such a proceeding currently under consideration by the CR Board, In re Digital Performance Right in Sound Recordings and Ephemeral Recordings, Docket No. 2009-1 (CR Board Webcasting III) (the "Webcasting III" proceeding).  Compl. ¶ 5.  On January 5, 2009, pursuant to 17 U.S.C. § 803(b)(1)(A)(i), the Webcasting III proceeding was commenced

through a request for Petitions to Participate.  Id. ¶ 26.  The Webcasting III proceeding is being

conducted in order for the CR Board judges to designate the royalty rates for the next five-year

statutory period for parties unable to reach a voluntary agreement and the next rate designations

will be in effect from 2011 through 2015.  Id.; Defs.' Mot. at 7.  The Webcasting III proceeding

must be completed by December 16, 2010, id. ¶ 27, and on June 24, 2009, the CR Board issued

an order setting September 29, 2009, as the deadline for parties to submit their written direct

statements, which must address the participants' concerns and views on what the rates should be

for the period commencing in 2011. Id. ¶ 30.

 "Live365 is an aggregator of digital radio stations that operates under compulsory

licenses" that are regulated by the CR Board under 17 U.S.C. §§ 112 and 114.  Compl. ¶ 5.

According to the plaintiff, Live365 has paid approximately one million dollars per year in

royalties for the use of copyrighted works since 2005.  Plaintiff's Memorandum of Points and

Authorities in Support of Its Application for a Preliminary Injunction ("Pl.'s Mem.") at 7.

Live365 is among the various parties that have been unable to reach an agreement and thus has

filed its Petition to Participate in the Webcasting III proceeding.  Compl. ¶ 29; Defs'. Mot. at 7,

9.[4] As of September 29, 2009, other than the initial filing of the petition and the withdrawal of

several parties from participation in the matter, no further action had taken place in the

Webcasting III litigation.  Compl. ¶ 29.

B. Plaintiff's Claims

 The plaintiff brings this lawsuit seeking declaratory and injunctive relief, claiming that

the Librarian's power to appoint the CR Board judges violates the Appointments Clause of the

---

[4] While Live365 is a single webcaster among many in the Webcasting III proceeding, SoundExchange alone represents thousands of copyright owners.  Int. Def.'s Mem. at 3-4.  Furthermore, SoundExchange is the only party in the Webcasting III proceeding representing the interests of copyright owners.  Id. at 3.  Thus, the numerous webcasters, like Live365, that are a party to this litigation represent interests contrary to SoundExchange's .  Id. at 4.  Therefore, SoundExchange moved to intervene to represent the private interests at stake in this litigation.  Id.

Constitution, U.S. Const. art. II, § 2, cl. 2.  Compl. ¶ 1.  Specifically, the plaintiff claims that the

CR Board judges are principal officers who may only be appointed by the President.  Id. ¶ 39.

Alternatively, they argue that if the CR Board judges are inferior officers  their appointments are

nonetheless unconstitutional because the Librarian of Congress is an officer of the Legislative

Branch and not a Head of Department in the Executive Branch, and therefore, he lacks

constitutional authority to appoint inferior officers.  Id.  Accordingly, plaintiff seeks to have the

2004 amendments to the Copyright Act, which authorizes the Librarian to appoint judges to the

CR Board, held unconstitutional and the Webcasting III proceedings enjoined until its challenge

to the constitutionality of the statute is resolved.  Id.

## II. Analysis

A.      The Defendants' Motion to Dismiss

Once a defendant has moved to dismiss a case pursuant to Federal Rule of Civil

Procedure 12(b)(1), "the plaintiff bears the burden of establishing the factual predicates of

jurisdiction by a preponderance of the evidence."  Erby v. United States, 424 F. Supp. 2d 180,

182 (D.D.C. 2006) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)) (other

citations omitted).  "The [C]ourt, in turn, has an affirmative obligation to ensure that it is acting

within the scope of its jurisdictional authority."  Abu Ali v. Gonzales, 387 F. Supp. 2d 16, 17

(D.D.C. 2005) (internal quotation marks and citation omitted).  Therefore, when ruling on a Rule

12(b)(1) motion to dismiss, courts "may consider materials outside the pleadings" to determine

whether it has jurisdiction over the claims advanced by the plaintiff.  Jerome Stevens Pharm.,

Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citation omitted); see also Haase v. Sessions,

835 F.2d 902, 906 (D.C. Cir. 1987) (stating that "[i]n [Rule] 12(b)(1) proceedings, it has been

long accepted that the judiciary may make appropriate inquiry beyond the pleadings to satisfy

itself on [its] authority to entertain the case") (internal citations and quotation marks omitted). Nonetheless, even where a defendant mounts a facial  challenge to the complaint's assertion of the court's jurisdiction, "the court must still accept all of the factual allegations in the complaint as true." Jerome Stevens Pharm., 402 F.3d at 1253 (internal quotation marks and citations omitted); see Erby, 424 F. Supp. 2d at 182 (noting that where "a defendant mounts a 'facial' challenge to the legal sufficiency of the plaintiff's jurisdictional allegations, the [C]ourt must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party") (citations omitted).

As an initial matter, the Court must address whether the defendants are entitled to dismissal under Rule 12(b)(1) of the Federal Rules of Civil Procedure based on the Court's inability to exercise jurisdiction over the plaintiff's Appointments Clause challenge.  The defendants contend that this Court cannot entertain the plaintiff's challenge, arguing that jurisdiction to review such a challenge lies exclusively with the District of Columbia Circuit. Defendants' Memorandum of Points and Authorities 1) In Support of Its Motion to Dismiss and 2) In Opposition to the Plaintiff's Motion for Preliminary Injunction ("Defs.' Mem.") at 10.  As support for their position, the defendants argue that under 17 U.S.C. § 803(d)(1), "'[a]ny determination' of the Copyright Royalty Judges in the Webcaster III proceeding [is vested exclusively with] the District of Columbia Circuit." Id. (internal quotation marks and citation omitted).   Furthermore, the defendants contend that this case does not come within the exception that permits a district court to exercise jurisdiction over "'facial challenge[s]' to the constitutionality of a statute under which the agency was proceeding," id. at 12, because the plaintiff's claim is a direct challenge to the Webcaster III proceeding itself, id. at 13.  In this regard, the defendants argue that this case is distinguishable from Free Enterprise Fund v. Public

Co. Accounting Oversight Bd., 537 F.3d 667, 676 (D.C. Cir. 2008), cert. granted, __ U.S. __,

129 S. Ct. 2378 (2009), and Time Warner Entertainment Co. v. FCC, 93 F.3d 957 (D.C. Cir.

1996), because here the plaintiff's suit "is not independent of any administrative proceeding." Id.

Specifically, the defendants claim that, "among other things," the plaintiff is seeking to have an

order issued by the CR Board judges in the Webcasting III proceeding altered to extend a filing

deadline imposed by that order.  Id.  Therefore, the defendants contend that jurisdiction rests

exclusively with the District of Columbia Circuit.  Id.

The plaintiff responds that this Court has jurisdiction over its Appointments Clause

challenge because it "arises under, inter alia, 28 U.S.C. § 1331, which on its face states that

'district courts shall have original jurisdiction of all civil actions arising under the Constitution.'"

Plaintiff's Consolidated Opposition to Motion to Dismiss and Reply to Oppositions to Motion

for Preliminary Injunction ("Pl.'s Reply") at 6 (internal citation omitted).  And it notes that

"[t]he gravamen of the Complaint is a request for declaratory relief via a facial constitutional

challenge to the [manner in which the CR Board judges are appointed, and does not] ask this

Court to review any specific action the CR[ Board] has taken or might take." Id.  Further, the

plaintiff asserts that its claims are fully independent of the Webcaster III proceeding and "[t]he

fact that the preliminary injunction sought here merely pertains to a CR[Board] proceeding does

not change that the underlying claim in the Complaint has no connection to any action by the

CR[ Board]." Id. at 9.  Moreover, the plaintiff points out that while the relevant provision of the

Copyright Act, 17 U.S.C. § 803(d)(1), specifically vests jurisdiction in the District of Columbia

Circuit to consider all appeals of "determination[s] of the [CR Board] Judges," Pl.'s Reply at 7

(internal citation omitted), it does not limit the jurisdiction of facial challenges to the

constitutionality of the Copyright Act itself to the District of Columbia Circuit.  Id. at 7-8.  Thus,

citing Free Enterprise as support for its position, the plaintiff argues that this Court has

jurisdiction to entertain  such facial constitutional challenges.  Id. at 8-9.

Generally, "where a statute commits review of agency action to the Court of Appeals,

any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the

exclusive review of the Court of Appeals."  Telecomm. Research & Action Ctr. v. FCC (TRAC),

750 F.2d 70, 78-79 (D.C. Cir. 1984).  However, the constitutional facial challenges here

"advance[] a 'broad-scale attack' . . . to the [Copyright] Act itself that is not 'of the type

Congress intended to be reviewed within this statutory structure."  Free Enter., 537 F.3d at 671

(quoting Nat'l Mining Ass'n v. Dep't of Labor, 292 F.3d 849, 856 (D.C. Cir. 2002) and Thunder

Basin Coal Co. v. Reich, 510 U.S. 200, 212 (1994)); cf. Am. Coal. for Competitive Trade v.

Clinton, 128 F.3d 761, 765 (D.C. Cir. 1997) (holding that a district court does not have

jurisdiction to hear constitutional challenges if a statute specifically grants "exclusive original

jurisdiction" to the Court of Appeals to consider such challenges).  In such situations, district

courts have

> general federal question jurisdiction to consider a facial challenge to a statute's
> constitutionality so long as that challenge is not raised in a suit challenging the
> validity of agency action taken pursuant to the challenged statute or in a suit that
> is collateral to one challenging the validity of such agency action.

Time Warner, 93 F.3d at 965.  To fall within this category of challenges, the challenge must

present "a 'facial, or systemic' challenge, and not an 'as-applied, or particularized challenge[],'

. . . and [cannot] attempt to bootstrap other claims regarding a[n] [administrative] Board['s]

order or rule."  Free Enter., 537 F.3d at 671 (citations omitted).

In Time Warner, the plaintiff sought an order from a district court enjoining the Federal

Communications Commission ("FCC") from issuing any regulations under provisions of the

Cable Television Consumer Protection and Competition Act—"and two provisions of its

predecessor"—(the "Cable Acts"), 47 U.S.C. § 402 (1992), which the plaintiff deemed unconstitutional. 93 F.3d at 963-64. The defendants and three intervenor defendants contested the district court's jurisdiction to consider the plaintiff's challenge stating that the relief the plaintiff requested "would circumvent the process for judicial review provided for by statute." Id. at 964. The district court sided with the plaintiff, and the District of Columbia Circuit affirmed, finding that even though "[t]he Communications Act, of which the Cable Acts are a part, vests the courts of appeals with jurisdiction to . . . enjoin, set aside, annul, or suspend any order of the [FCC] under the Act," id. (citations and internal quotation marks omitted), the district court nonetheless had jurisdiction to hear the case because the plaintiff's challenge was "entirely independent of any agency proceedings, whether actual or prospective." Id. at 965. (citations and internal quotation marks omitted). Similarly, in Free Enterprise, the plaintiffs challenged the constitutionality of the Public Company Accounting Oversight Board, a board of judges created by the Securities Exchange Commission to enforce the provisions of the Sarbanes-Oxley Act of 2002, 15 U.S.C. §§ 7211-19. 537 F.3d at 668-70. The plaintiffs argue that the statute establishing the Board rendered the Board "unaccountable and divorced from Presidential control to a degree not previously countenanced in our constitutional structure . . . [making it] inconsistent with individual liberty." Id. at 667-68. The District of Columbia Circuit again held that the challenge had been properly filed in the district court because it presented a facial challenge rather than an "as-applied, or particularized challenge." Id. at 671 (citation omitted).

Here, the Copyright Act provides that "[a]ny determination of the Copyright Royalty Judges . . . may . . . be appealed, to the United States District Court of Appeals for the District of Columbia Circuit, by any aggrieved participant in the proceeding." 17 U.S.C. § 803(d)(1). The

text of the statute therefore limits judicial review of <u>determinations</u> of the CR Board judges to

the District of Columbia Circuit.  The plaintiff's Appointments Clause challenge is not a

challenge of that nature, but rather is an attack on the 2004 amendment of the Copyright Act,

which "establish[ed] the CR[ Board, empowered] the Librarian of the Congress [with the

authority to] appoint[ the] three full-time [CR Board] Judges, [and] charged [its judges] with

establishing rates and terms for various statutory compulsory licenses for use of certain

copyrighted works."  Compl. ¶ 1.  Moreover, the plaintiff seeks "a declaration that 17 U.S.C. §

801 . . . is unconstitutional [and] in violation of the Appointments Clause of the U.S.

Constitution."  <u>Id.</u>  ¶ 2.  This action therefore falls squarely within the exception recognized by

<u>Time Warner</u> and <u>Free Enterprise</u>, which authorizes this Court to exercise jurisdiction over a

facial challenge to the constitutionality of a statute.  <u>See</u> <u>Gen. Elec. Co. v. EPA</u>, 360 F.3d 188,

190-91 (D.C. Cir. 2004) (reversing district court's refusal to exercise jurisdiction over pre-

enforcement constitutional challenge of statute that "postpones judicial review of any [agency]

action under [the statute at issue] until [the agency] seeks to enforce its remedial orders in court

or [an authorized party] sues to recoup its expenses for undertaking [action covered by the

statute]").

The government's argument that this case is distinguishable from <u>Free Enterprise</u> and

<u>Time Warner</u> because the Complaint targets a specific ongoing proceeding is unpersuasive.  In

<u>General Electric</u>, the plaintiff's due process challenge against the Environmental Protection

Agency ("EPA") pursued in this court was sanctioned by the Circuit despite there having been

"ongoing interactions over remediation at several locations" between the parties, because "the

lawsuit [did] not challenge any particular action or order by the EPA."  <u>Id.</u> at 191.  Thus,

although the plaintiff's injunction request could have the effect of extending the September 29,

2009 deadline set by the CR Board judges and could inevitably impact the progression of the

Webcasting III proceeding, their request for the injunction is derived from their constitutional

facial challenge to the appointment of the CR Board judges, which is wholly independent of any

action actually taken or expected to be taken in the future by the CR Board judges.  Time

Warner, 93 F.3d at 965 (noting that the facial constitutional challenge there could be entertained

by the district court because the challenge was "entirely independent of any agency proceedings,

whether actual or prospective").  And this is true despite the collateral impact this Court's

exercise of jurisdiction over the plaintiff's constitutional challenge would have on the already

initiated Webcasting III proceeding.  Id. at 963 (district court's exercise of jurisdiction over

facial constitutional challenge held proper even though agency was enjoined from proceeding

with already initiated rule-making process).  Furthermore, refusing to exercise jurisdiction here

"would do nothing to advance the primary policy" objective for vesting exclusive jurisdiction

with courts of appeals.  Id. at 965.   This policy objective of according exclusive jurisdiction to

appellate courts due to the expertise they have developed "concerning the agencies assigned [to]

them for review," and therefore "promot[ing] judicial economy and fairness to litigants by taking

advantage of that expertise," id. (citing TRAC, 750 F.2d at 78), does not dictate a different result

because "[q]uestions concerning the constitutionality of an agency's enabling statute . . . do not

require any particular agency expertise," id.  Accordingly, the plaintiff is "not jurisdictionally

barred from bringing this action in [this Court] . . . because TRAC does not deprive [this]

[C]ourt of its general federal question jurisdiction to consider a facial challenge to a statute's

constitutionality so long as that challenge is not [being] raised in a suit challenging the validity

of agency action taken pursuant to the challenged statute or in a suit that is collateral to one

challenging the validity of such agency action." Id.  Therefore, the government's motion to dismiss is denied.

B.      The Plaintiff's Motion for Preliminary Injunction

A preliminary injunction "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal citation and quotation marks omitted).  In deciding whether to order preliminary injunctive relief, the Court "must examine whether '(1) there is a substantial likelihood that the plaintiff will succeed on the merits; (2) [the] plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction.'" Ellipso, Inc. v. Mann, 480 F.3d 1153, 1157 (D.C. Cir. 2007) (quoting Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).  These factors should be balanced against each other and "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Id. (quoting Serono Labs., 158 F.3d at 1318).  Thus, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success of the merits even if there is a relatively slight showing of irreparable injury." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995).  However, the party seeking injunctive relief must "demonstrate at least some injury," id. (emphasis added, internal citation and quotation marks omitted), but even if the party seeking the injunction "satisf[ies] the irreparable harm prong, . . . a preliminary injunction will not issue unless the moving party also shows, on the same facts, a substantial likelihood of success on the merits." Chaplaincy, 454 F.3d at 304; see also Apotex, Inc. v. FDA, 449 F.3d 1249, 1253-54 (finding that if the plaintiff "has little likelihood of succeeding on the merits of its

claim[, there is] no need to address the other [factors necessary to issue a preliminary

injunction]") (citing City of Las Vegas v. Lujan, 891 F.2d 927, 935 (D.C. Cir. 1989).


      1.      <u>The Substantial Likelihood the Plaintiff will Prevail on the Merits</u>

      The plaintiff advances two arguments for why it will succeed on the merits of its request

for declaratory relief.  First, the plaintiff argues that the CR Board judges are "principal officers"

under the Appointments Clause of the Constitution, and therefore, must be appointed by the

President.  Compl. ¶ 39; Pl.'s Mem. at 11-14.  Second, the plaintiff argues that even if the CR

Board judges are only "inferior officers" under the Constitution, they were appointed to their

positions in violation of the Appointments Clause because the Librarian of Congress is a

Legislative Officer rather than a Head of Department of the Executive Branch, and therefore

lacks authority under the Constitution to appoint inferior officers.  Compl. ¶ 39; Pl.'s Mem. at

14-17.  For the reasons that follow, the plaintiff has failed to demonstrate there is a substantial

likelihood it will succeed on either theory.

      a.      <u>The Plaintiff's Principal Officer Theory</u>

      The plaintiff first argues that the CR Board judges are principal officers and therefore

must be appointed by the President.  Pl.'s Mem. at 11.  Specifically, the plaintiff argues that the

judges function independently without the supervision of the Librarian, and that the relevant

provisions of the Copyright Act indicate that they function as principal officers.  Id. at 11-12.  To

further support this contention, the plaintiff relies on Morrison v. Olson, 487 U.S. 654, 671-73

(1988), which observed that some of the indicia of "inferior" officers are their limited duties,

limited jurisdiction, temporary tenure, and the ability to be removed from office by the

appointing officer.  Id. at 12.  The plaintiff asserts that the CR Board judges have no such

limitations, noting that "in setting rates and terms under the various statutory compulsory licenses in the Copyright Act, [the CR Board judges] exercise significant [legal] authority . . . to create their own rules of procedure, . . . which are subject only to review by the Librarian, and there is no evidence the Librarian has actually exercised such review[, they] may not be removed without substantial cause . . . [, and they] have the authority to issue final rate decisions with 'full independence' and their decisions are not subject to reversal by any other executive branch office, but instead are appealed directly to the D.C. Circuit."  Pl.'s Reply at 25-26.  The plaintiff further points to the CR Board judges not being subject to performance appraisals by their superiors, and their ability to monitor discovery, question witnesses, make evidentiary rulings, issue subpoenas, and grant protective orders in conjunction with their decision-making authority.  Pl.'s Mem. at 12-14.  Additionally, the plaintiff contends that further proof that the CR Board judges are principal officers is the fact that any of their findings determined to be incorrect by the Register of Copyrights are binding as precedent only on subsequent proceedings.  Id. at 13-14; see generally 17 U.S.C. § 801.  Finally, the plaintiff points out that many of the responsibilities now vested in the CR Board judges were also vested in the Copyright Royalty Tribunal, the predecessor of the CR Board, and the members of that body were not appointed by the Librarian of Congress, but rather by the President as principal officers.  Pl.'s Mem. at 14.

Conversely, the defendants argue that while there is no bright line distinguishing principal officers from inferior officers,[5]  Def.s' Mem. at 18, "[t]he critical factor for determining" whether an individual is a principal officer for purposes of the Appointments Clause "is whether the officer is 'supervised at some level'" by others "who are appointed directly by the President."  Defs.' Mem. at 20 (quoting Edmond v. United States, 520 U.S. 651, 663 (1997); Intervenor-Applicant SoundExchange's Opposition to Plaintiff Live365, Inc.'s

---

[5] The term "defendants" refers to both the government and intervenor SoundExchange where each party raised identical arguments.

Motion/Application for Preliminary Injunction ("Int. Defs.' Opp'n") at 12-14.  Citing Morrison, Edmond, and Freytag v. Comm'r of Internal Revenue, 501 U.S. 868, 884 (1991), all cases in which the appointees in question exercised a fair amount of authority in the administration of their duties, the defendants note that the Supreme Court nonetheless found those officers had inferior status, despite their considerable authority and limited supervision.  Defs.' Mem. at 20-22; Int. Def.'s's Opp'n at 11-13.  The defendants argue that under the standard for assessing principal versus inferior officer status, it is insufficient to base that determination on the fact that the CR Board judges are accorded some level of autonomy, but rather the determination that the CR Board judges are inferior officers is controlled by the fact that their work is directed and "supervised at some level by other officers who are appointed directly by the President."  Defs.' Mem. at 20 (quoting Edmond, 520 U.S. at 663); see also Int. Def.'s Opp'n at 11-13.  Specifically, they argue that the CR Board judges are expressly required to abide by the regulations issued by the Librarian of Congress, Defs.' Mem. at 20; Int. Def.'s Opp'n at 13, and the Librarian also has authority through the Register of Copyrights, who is also appointed by the Librarian, to review and correct the substantive determinations of the CR Board judges.  Defs.' Mem. at 21; Int. Def.'s Opp'n at 14.  Additionally, and in opposition to the plaintiff's claim to the contrary, the defendants assert that merely because the Librarian may only remove the CR Board judges for cause is not dispositive of their status as principal officers, Defs.' Mem. at 22; Int. Def.'s Opp'n at 12, noting that the officers in Morrison and Free Enterprise could not be removed without cause either, but nonetheless were deemed to be inferior officers because a superior officer appointed by the President had authority, albeit limited, to remove them from office.  Defs.' Mem. at 22; Int. Def.'s Opp'n at 12-13.

In further support of their argument, the defendants state that under the Copyright Act, the judges are also required to obtain a written opinion from the Register of Copyrights "on all

novel and material questions of copyright law," and the judges are required to apply the
Register's conclusions in making all future determinations.  Defs.' Mem. at 21; Int. Def.'s Opp'n
at 14.  Further, SoundExchange notes that the CR Board judges "have very narrow jurisdiction
and limited duties," as the scope of their power is confined to "the establishment of royalty rates
and the distribution of royalties for a small number of compulsory licenses."  Int. Def.'s Opp'n at
14.  Thus, SoundExchange asserts that the CR Board judges are similar in this respect to the
independent counsel in Morrison and the judges in Edmond and Freytag, all whom were deemed
inferior officers for purposes of the Appointments Clause.  Id. 14-15.  Lastly, the defendants
refute the significance the plaintiff seeks to draw from the status the members of the Copyright
Royalty Tribunal (the CR Board's predecessor) held as principal officers, noting that unlike the
CR Board, the Copyright Royalty Tribunal had been specifically established by Congress as "a
freestanding administrative agency, not subject to supervision by the Librarian or any other
principal officer," Defs.' Mem. at 31, thus distinguishing it from the CR Board for Appointments
Clause purposes.  Id. at 32.

      Article II, Section 2, clause 2 of the Constitution provides:

> [The President] shall nominate, and by and with the Advice and Consent of the
> Senate, shall appoint Ambassadors, other Public Ministers and Consuls, Judges of
> the Supreme Court, and all other Officers of the United States, whose
> Appointments are not herein otherwise provided for, and which shall be
> established by Law: but the Congress may vest the Appointment of such inferior
> Officers, as they think proper, in the President alone, in the Courts of Law, or in
> the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.  Thus, the Appointments Clause divides all officers of the United
States into two categories: principal officers and inferior officers.  The Appointments Clause "is
more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of
the constitutional scheme."  Edmond, 520 U.S. at 659.  Principal officers must be appointed by
the President with the advice and consent of the Senate, while Congress may authorize the

appointment of inferior officers by the President acting alone, independently by the Courts of Law or the Heads of Departments.  Buckley v. Valeo, 424 U.S. 1, 132 (1976).  Although there is no bright line rule distinguishing principal and inferior officers, inferior officers usually have "a relationship with some higher ranking officer or officers below the President," and their "work is directed and supervised at some level by others who were appointed by Presidential nomination with the advise and consent of the Senate."  Edmond, 520 U.S. at 662-63.  Furthermore, "[t]he exercise of significant authority pursuant to the laws of the United States marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather . . . the line between officer and nonofficer."  Id. at 662 (internal quotation marks and citation omitted).

In Morrison, a case in which the Supreme Court addressed whether the appointment of an independent counsel violated the Appointments Clause, the plaintiffs argued that the appointment was invalid because the position had principal officer status and the independent counsel had been appointed by a statutorily created court at the request of the Attorney General and not by the President with the consent of the Senate.  487 U.S. at 660-61.  The Morrison Court concluded that the independent counsel was an inferior officer because she was "subject to removal by a higher Executive Branch official," id. at 671; "she was empowered by [statute] to perform only certain, limited duties," id.; "[her] office was limited in jurisdiction," id. at 672; and her "office [was] limited in tenure," id.  However, the Morrison Court found it unnecessary "to decide exactly where the line falls between the two types of officers," concluding that the independent counsel "clearly [fell] on the 'inferior officer' side of that line."  Id. at 671.

Attempting to distinguish Morrison, the petitioners in Edmond argued that civilian judges appointed to the Coast Guard Court of Appeals by the Secretary of Transportation were principal officers because two of the factors considered significant by the Morrison Court—limited jurisdiction and limited tenure—were not the situation in Edmond.  520 U.S. at 661.  The

Supreme Court found the absence of these two factors not determinative, emphasizing that Morrison "did not purport to set forth a definitive test for whether an office is 'inferior' under the Appointments Clause." Id. The Court held that the Coast Guard judges were inferior officers because their work was supervised at some level by the Judge Advocate General, who among other things, had the power to remove them without cause, and also the Court of Appeals for the Armed Forces, an Executive Branch entity, which had the power to reverse decisions of Coast Guard judges. Id. at 664. Accordingly, an officer can be considered "inferior" if his or her "work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate, . . . and, if not, might still be considered [an] inferior officer[] if the nature of their work suggests sufficient limitations of responsibility and authority." United States v. Hilario, 218 F.3d 19, 25 (1st Cir. 2000) (internal quotation marks and citation omitted).

Here, the CR Board judges receive direction and supervision by both the Librarian of Congress and the Register of Copyrights. Among the Librarian's oversight powers is his authority to promulgate binding ethical rules and to enforce those rules against the judges, 17 U.S.C. § 802(h), sanction or remove a Copyright Royalty Judge for violation of these rules, id. § 802(i), provide administrative resources for the judges, id. §§801(d), 801(e), and assign other duties to the judges as he deems appropriate, id. § 801(b)(8), so long as they do not "conflict with [the judges'] duties and responsibilities as a Copyright Royalty Judge," id. at § 802(g). Furthermore, the Register's authority over the CRB judges includes the power to review any decisions by the judges for "legal error," id. § 802(f)(1)(D), and provide written opinions on all novel and material questions of copyright law which then becomes binding on the judges, id. § 802(f)(1)(B). Lastly, the judges are required to act in accordance with prior determinations and

interpretations of the Copyright Royalty Tribunal, the Librarian of Congress, and the Register of Copyrights. Id. § 803(a)(1).

Despite these checks on the authority of the CR Board judges, the plaintiff insists that the judges are "free-standing, independent, and unsupervised fact finders" and therefore qualify as "Principal Officers." Pl.'s Mem. at 12-14. Moreover, they point to the observations of District of Columbia Circuit Judge Kavanaugh in his concurrence in SoundExchange, Inc., 571 F.3d at 1226, as support for their position that the CR Board judges are principal officers, wherein he stated:

> [B]illions of dollars and the fates of entire industries can ride on the Copyright Royalty Board's decisions. The Board thus exercises expansive executive authority analogous to that of, for example, FERC, the FCC, the NLRB, and the SEC. But unlike the members of those similarly powerful agencies, since 2004 Copyright Royalty Board members have not been nominated by the President and confirmed by the Senate. Instead . . . Board members are appointed by the Librarian of Congress alone . . . Th[is] new statutory structure raises a serious constitutional issue.

Id. However, while Judge Kavanaugh viewed the CR Board judges' exercise of "executive authority" as "expansive," this alone is insufficient to invalidate the constitutionality of the appointment of the CR Board judges under the test adopted by the Supreme Court. See Edmond, 520 U.S. at 662 (noting that despite the significant authority exercised by many officers in prior cases, the Court had nonetheless held those positions to be inferior "within the meaning of the Appointments Clause . . . [because] [t]he exercise of significant authority pursuant to the laws of the United States marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, as we said in Buckley, the line between officer and nonofficer"). Nonetheless, Judge Kavanaugh's observations are understandable. The current state of the law has essentially created a gray area where cases like this case will inevitably fall due to the case-by-case analysis lower courts are required to conduct as result of the limited guidance the

Framers of the Constitution provide as to where "[t]he line between 'inferior' and 'principal' officers . . . should be drawn," and the Supreme Court's refusal to "decide exactly where the line falls between the two types of officers." Morrison, 487 U.S. at 671; see also Edmond, 520 U.S. at 661 ("Our cases have not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes [and] Morrison did not purport to set forth a definitive test for whether an officer is 'inferior' under the Appointments Clause."). All this Court can do is consider those factors identified by the Supreme Court as relevant to the assessment of an officer's status under the Appointments Clause, Morrison, 487 U.S. at 671-73, with the appreciation that none of them are necessarily dispositive, as illustrated by Edmond, 520 U.S. at 661.

Upon careful examination of these factors and facts in this case, it appears that the CR Board judges are in fact sufficiently subordinate to both the Librarian of Congress and the Register of Copyrights to qualify as inferior officers, and thus, their appointments by the Librarian do not offend the Appointments Clause. In making this assessment, the Court finds that the conclusions reached in Edmond, Freytag, and Free Enterprise seem to support this position. In both Edmond and Freytag, the judges were held to be inferior officers despite the fact that their duties included taking testimony, ruling on the admissibility of evidence, issuing protective orders, and issuing subpoenas, and the CR Board judges exercise many of those same responsibilities. Thus, the guiding precedent of the Supreme Court seemingly requires the conclusion that despite the level of autonomy the CR Board judges exercise, the degree of direction and supervision exercised over them by the Librarian and the Register renders them inferior rather than principal officers.

b.      The Plaintiff's Inferior Officer Appointments Challenge

The plaintiff argues alternatively that even if the CR Board judges are inferior officers, the Appointments Clause requires that they be appointed either by the President, a Head of Department, or a Court of Law, and because this did not occur, their appointments are unconstitutional.  Pl.'s Mem. at 14.  The plaintiff posits that for the appointment of an inferior officer to be constitutional, "a Head of Department must be a cabinet-level department head in the [Executive B]ranch of government who reports and is directly accountable to the President." Id. at 15-16.  The plaintiff opines that the Librarian of Congress is part of the Legislative Branch, not the Executive Branch, because the Librarian reports to Congress and does not share the same accountability to the President as do other cabinet-level department heads.  Id.  The plaintiff therefore argues that the Librarian is not a Head of Department of the Executive Branch as required for Appointments Clause purposes.  Id. at 15-17.

In support of the plaintiff's argument concerning the status of the Librarian, it notes that "the Librarian reports to Congress," that the "[L]egislative [B]ranch funds the Library," and that "the Librarian cannot be removed without cause by the President because the statute is silent as to [his or her] removal.  Pl.'s Mem. at 16.  Further, the plaintiff contends that various sections of Title 2 of the United States Code reflects "Congress' intent that the Library of Congress [be] an instrumentality of Congress."  Pl.'s Reply at 17.  In addition, the plaintiff posits that the Librarian does not fall under the Executive Branch even under the more expansive view of Heads of Department taken by the Supreme Court in Freytag because aside from the President's appointment power, the Librarian does not report directly to the President.  Pl.'s Mem at 16.  Moreover, it argues that the Library portrays itself as a part of the Legislative Branch.  Id. at 17.  Specifically, the plaintiff references the Library's website, which indicates that it considers itself an "agency of the legislative branch of the U.S. government."  Id.  The plaintiff further contends that District of Columbia Circuit precedent has recognized the Library of Congress as part of the

Legislative Branch.  Id. at 16.  Namely, it notes that the District of Columbia Circuit has

exempted the Library from the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 (2006),

on the grounds that the provisions of the APA do not apply to the Legislative Branch, id. (citing

Washington Legal Found. v. U.S. Sentencing Comm'n, 17 F.3d 1446, 1449 (D.C. Cir. 1994),

and precluded a former Library employee from bringing a Rehabilitation Act, 29 U.S.C. § 701

(2008), claim, concluding that the Rehabilitation Act applies only to employees in the Executive

Branch, id. (citing Judd v. Billington, 863 F.2d 103, 105 (D.C. Cir. 1988).  Lastly, it notes that

although the Librarian is appointed by the President and serves at the President's pleasure, the

current Librarian has served since 1987 and seems to enjoy lifetime tenure.  Pl.'s Reply at 18-19.

        The defendants respond that the Librarian is a Head of Department within the meaning of

the Appointments Clause, Defs.' Mem. at 22; Int. Def.'s Opp'n at 15, and therefore even if the

CR Board judges are inferior officers, the Librarian had constitutional authority to appoint them.

As support for their position the defendants advance a number of theories, Defs.' Mem. at 22-27;

Int. Def.'s Opp'n at 15-16.  First, they note that the President was granted authority by Congress

to appoint the Librarian, and that Congress placed "[n]o . . . limits [on] the President's oversight

of the Librarian, nor . . . reserved to itself the power to review or influence the Librarian's

conduct [while] in office.  Defs.' Mem. at 23; see also Int. Def.'s Opp'n at 17.  In this regard,

they note that the President has unlimited "power to remove the Librarian, which is an incident

of the power of appointment,"  Defs.' Mem. at 23; see also Int. Def.'s Opp'n at 17, drawing on

the history of the Library as support for their position.  Defs.' Mem. at 24-25; Int. Def.'s Opp'n

at 17.  Next, the defendants argue that the Library functions as an Executive Department for

Appointments Clause purposes.  Defs.' Mem. at 25-28; Int. Def.'s Opp'n at 18-20.  They direct

the Court to the congressional history of the Copyright Act, which indicates that Congress

considered the legislative and executive functions of the Librarian before vesting him with

appointment power of the Register of Copyrights, and argue that Congress considered the

constitutional validity of the Librarian's appointment power and concluded that the Library is a

department in the Executive Branch.  Defs.' Mem. at 24-25; Int. Def.'s Opp'n at 17-20.  They

contend that the "Library possesses all of the features that traditionally distinguish the executive

departments," including being "a free-standing entity, not contained within any other

administrative agency," "[i]t performs executive functions, including . . . administration of the

copyright laws," and it "is headed by a principal 'Officer[]' of the United States' who is

appointed by the President and removable at his will."  Defs.' Mem. at 26; see also Int. Def.'s

Opp'n at 19-20.  Furthermore, SoundExchange notes that the Fourth Circuit has stated that "[i]t

is irrelevant that the Office of the Librarian of Congress is codified under the legislative branch

or that it receives its appropriation as a part of the legislative branch [because] the Librarian

performs certain functions which may be regarded as legislative . . . and other functions . . .

which are executive or administrative."[6]  Int. Def.'s Opp'n at 19-20 (internal citation omitted and

emphasis in original). Thus, the defendants refute the plaintiff's argument that because the

Library is designated for statutory purposes as a Legislative entity it is not an executive office,

noting that other agencies, like the Federal Election Commission, are codified in the Legislative

Branch, but have nonetheless been determined to "wield[] executive authority."  Int. Def.'s

Opp'n at 19; see also Defs.' Mem. at 30.  Accordingly, the defendants claim that the Librarian is

a principal officer that heads an Executive Department and therefore has the power to appoint

inferior officers.  Defs.' Mem. at 22; Int. Def.'s Opp'n at 20.

    "Any appointee exercising significant authority pursuant to the laws of the United States

is an 'Officer of the United States' and must, therefore, be appointed in the manner prescribed by

---

[6] The Fourth Circuit ruled that the Register of Copyrights is constitutionally appointed by the Librarian under the
Appointments Clause because the Library is an executive office.  Eltra Corp. v. Ringer, 579 F.2d 294, 300 (4th Cir.
1978).

§ 2, cl. 2 of Article II [of the Constitution]." Freytag, 501 U.S. at 881 (quoting Buckley, 424 U.S. at 126). Accordingly, the appointment of inferior officers must be made either by the President alone, the courts of law, or by the Heads of Departments. See Buckley, 424 U.S. at 132. In Freytag, the Court limited the term "Heads of Department" to "a part or division of the executive governments, [such] as the Department of State, or of the Treasury." 501 U.S. at 886 (quoting United States v. Germaine, 99 U.S. 508, 510-11 (1878)). However, in a footnote, the Court refused to address "any question involving an appointment of an inferior officer by the head of one of the principal agencies, such as the Federal Trade Commission, the Securities Exchange Commission, the Federal Energy Regulatory Commission, the Central Intelligence Agency, and the Federal Reserve Bank of St. Louis." Id. at 887, n.4. Although the appointment of the Librarian has not been addressed by the Supreme Court or the District of Columbia Circuit, the Fourth Circuit held that "the Office of the Register of Copyrights is not open to any charge that it is violative of the Appointments Clause," because "[t]he Register is appointed by the Librarian of Congress, who in turn is appointed by the President with the advice and consent of the Senate." Eltra Corp. v. Ringer, 579 F.2d 294, 300 (4th Cir. 1978).

In Free Enterprise, the plaintiffs, like Live365, attempted to prevail on the theory that even if the Public Company Accounting Oversight Board created by the Sarbanes-Oxley Act was an inferior office, its members were unconstitutionally appointed by the Security and Exchange Commission ("SEC") because it "is not a 'Department[]' and the Commissioners are not its 'Head[]'" for purposes of the Appointments Clause. 537 F.3d at 672. One of the arguments advanced by the plaintiffs in Free Enterprise was that because the SEC was comprised of more than one person, it could not be a Head of Department for appointment purposes. Id. at 676. Relying on Freytag, the District of Columbia Circuit held:

> Just as independent agencies are 'Departments' capable of receiving appointment powers even though they are structured to give the President less control over their functioning . . .[,] heads of independent agencies need not be wholly controlled by the President as long as they are principal officers appointed (with the advice and consent of the Senate) and removable by the President.

Free Enter., 537 F.3d at 677.  Holding that the SEC is a principal office with appointment power, the court pointed out that Congress specifically vested the SEC with authority to control the administration of the securities laws, including the power to promulgate rules, review disciplinary sanctions, appoint Board members, approve Board rules and the Board's budget, and censure and remove Board members.  Id. at 677-78.

Here, there are several critical factors that indicate that the Library is an executive department for purposes of the Appointments Clause.  Most importantly, the Librarian is appointed by the President with the advice and consent of the Senate.  2 U.S.C. § 136.  In addition, the President, not Congress, has the power to remove the Librarian at will.  Id.  While the plaintiff is correct that the Library is codified under Title 2 of the United States Code, which addresses specifically the Legislative Branch, the court in Eltra found this irrelevant, holding that "such code-grouping cannot determine whether a given function is executive or legislative."  579 F.2d at 301.  Moreover, the court in Eltra also noted that "[t]he Librarian performs certain functions which may be regarded as legislative (i.e., Congressional Research Service) and other functions (such as the Copyright Office) which are executive or administrative," and "[b]ecause of its hybrid character, it could have been grouped code-wise under either the legislative or executive department."  Id.  But, the court found "such code-grouping" not to be dispositive, concluding "that the Copyright Office is an executive office, operating under the direction of an Officer of the United States and as such is operating in conformity with the Appointments Clause."  Id.  Furthermore, the Buckley Court stated in the same vein:

> Unless their selection is elsewhere provided for, all Officers of the United States are to be appointed in accordance with the [Appointments] Clause.  Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary. No class or type of officer is excluded because of its special functions. The President appoints judicial as well as executive officers. Neither has it been disputed and apparently it is not now disputed that the Clause controls the appointment of the members of a typical administrative agency even though its functions, as this Court recognized in Humphrey's Executor v. United States, 295 U.S. 602, 624 (1935), may be "predominantly quasijudicial and quasilegislative" rather than executive.  The Court in that case carefully emphasized that although the members of such agencies were to be independent of the Executive in their day-to-day operations, the Executive was not excluded from selecting them.

424 U.S. at 132-34 (quoting Humphrey's, 295 U.S. at 625-26).  Following the reasoning of Buckley and Eltra, this Court finds that even though the Library is codified under Title II and is a free standing entity that operates independently from the Executive Branch in conducting its daily operations, the Librarian appears to nonetheless qualify as a Head of Department with executive authority to appoint inferior officers. See Freytag, 501 U.S. at 920 (Scalia, J., concurring) (stating that "there is no reason, in text, judicial decision, history, or policy, to limit the phrase 'the Heads of Departments' in the Appointments Clause to those officials who are members of the President's Cabinet. . . . [Instead,] a department is [a] separate allotment or part of business; a distinct province, in which a class of duties are allotted to a particular person . . . . [The Founders [of the Constitution] chose the  word 'Departmen[t],' however, not to connote size or function (much less Cabinet status), but [a] separate organization . . .)(internal citation and quotation marks omitted).  As the court stated in Eltra:

> The Register is appointed by the Librarian of Congress, who in turn is appointed by the president with the advice and consent of the Senate.  By the nature of his appointment the Librarian is a[] [principal] [o]fficer of the United States, with the usual power of such officer to appoint 'such inferior [o]fficers (i.e., the Register [and the CR Board judges]), as (he) think(s) proper.

579 F.2d at 300 (internal citation and quotation marks omitted).  Accordingly, the Librarian is seemingly a principal officer that heads an Executive Department, and therefore, has the power to appoint inferior officers.  Thus, given the manner in which the Librarian is appointed and considering many of the functions assigned to him, the plaintiff has not met its burden of showing that there is a <u>substantial</u> likelihood that it will succeed on the merits of its alternative Appointments Clause challenge.

        2.    <u>Irreparably Harmed</u>

The plaintiff argues that it will suffer irreparable harm in several ways if an injunction is not granted, primarily resulting from being required to participate in the <u>Webcasting III</u> proceeding if the CR Board judges "are later determined to have been unconstitutionally seated in derogation of the Appointments Clause." Pl.'s Mem. at 17-18.  The plaintiff notes that where constitutional rights are involved, many courts have found that no further showing of irreparable injury is necessary, citing a series of cases where First, Fifth, and Fourteenth Amendment rights were at issue.  <u>Id.</u> at 17 & n.12.  The plaintiff also argues that it will incur significant legal costs if it is forced to participate in the <u>Webcasting III</u> proceeding.  <u>Id.</u> at 18.  Specifically, the plaintiff argued that if the proceedings were not stayed before September 29, 2009, it would be required to potentially expend over one million dollars preparing "its written direct case on [the] 2011-2015 webcasting royalty rates"[7] and otherwise preparing and presenting its case before the CR Board judges, which would include "locating, retaining and paying expert witnesses, preparing written statements to support the case in chief, and all other ensuing costs of discovery, cross-examination, briefing, [and] preparing and presenting testimony." <u>Id.</u> at 18-19.  And it notes that

---

[7] Obviously, the September 29 date has long passed.  However, the application for injunctive relief was not submitted to the Court until September 2, 2009, and the motion was calendared for a hearing as soon thereafter as possible.  And due to the complexity of the issues raised by the parties and the press of other cases on this Court's docket, the motion has been addressed as expeditiously as possible.

even if this Court ultimately rules in its favor on its constitutional challenge, without an injunction it will incur the expenses related to these activities without any potential of recovering them from the defendants due to the Eleventh Amendment's grant of governmental immunity from suit for the recovery of monetary damages.  Id. at 19.  Finally, the plaintiff contends that while the payment of litigation expenses is generally not grounds for an irreparable harm finding, the rule is inapplicable where the plaintiff is forced to incur expense as a result of having to participate in an unconstitutional proceeding.  Pl.'s Reply at 29-30.

The defendants respond that a plaintiff seeking an injunction must show that irreparable injury is likely, rather than just merely possible.  Defs.' Mem. at 32.  The defendants argue that the plaintiff's mere assertion that it will suffer litigation expenses is insufficient to constitute irreparable harm, Defs.' Mem. at 33; Int. Def.'s Opp'n at 20-21, and that the Supreme Court has already closed the door on the plaintiff's position to the contrary.  Defs.' Mem. at 33; Int. Def.'s Opp'n at 20.  Further, the defendants opine that proceedings allegedly tainted by a violation of the Appointments Clause is an insufficient basis for establishing irreparable harm, considering that the plaintiff relies solely on cases that have found irreparable harm based on alleged constitutional violations falling under the First, Fourth, Fifth, and Fourteenth Amendments. Defs.' Mem. at 34-36.  Finally, the defendants contend that the plaintiff's financial expenditure based argument is factually misleading, arguing that much of the litigation costs the plaintiff will incur through participating in the Webcasting III proceeding have already been incurred.  Defs.' Mem. at 37-38; Int. Def.'s Opp'n at 21-23.  Specifically, they state that the plaintiff would have already undertaken the effort of locating expert witnesses to support its economic theories and commenced the process of preparing the papers that were scheduled to be filed on September 29, 2009.  Defs.' Mem. at 37; Int. Def.'s Opp'n at 22.  Furthermore, they note, the evidentiary hearings and discovery that Live365 will participate in had not yet been scheduled when its

request for injunctive relief was made and at that time it was several months before these events

would have occurred.  Defs.' Mem. at 37; Int. Def.'s Opp'n at 23.  SoundExchange also notes

that Live365 is not being forced to incur litigation costs because its "participation in the

[Webcasting III] proceeding is entirely voluntary." Int. Def.'s Opp'n at 21.

The Supreme Court has held that "[m]ere litigation expense, even substantial and

unrecoupable cost, does not constitute irreparable injury," FTC v. Standard Oil Co., 449 U.S.

232, 244 (1980) (citation and internal quotation marks omitted), and in this case the plaintiff has

alleged nothing more than the potential expenditure of unrecoverable litigation costs.  While

these expenses are likely to be substantial based on the plaintiff's representations, the Supreme

Court has clearly held that this alone is insufficient to establish irreparable harm.  Moreover, the

defendants are logically correct in noting that much of the plaintiff's preparation should have

already been completed by the time the request for the injunction was made.  Finally, the Court

disagrees with the plaintiff's assertion that this Court should conclude that the mere allegation of

a constitutional violation is sufficient to constitute irreparable injury, even if the injury is merely

financial.  Pl.'s Mem. at 17; Pl.'s Reply Mem. at 28-29.  The treatise authored by Wright, Miller

& Kane is often cited for the proposition that "[w]hen an alleged deprivation of a constitutional

right is involved, most courts hold that no further showing of irreparable injury is necessary."

Fed. Prac. & Proc. 11A § 2948.1 (1995). However, plaintiffs relying on this principle usually

assert personal denial of a constitutional right.  For example, in McCormick v. Hirsch, 460 F.

Supp. 1337, 1349 (M.D. Pa. 1978), one of the cases relied upon by the plaintiff, the court found

that the plaintiff's assertion of a constitutional violation depriving him personally of his First

Amendment right had sufficiently demonstrated irreparable harm, but that finding was made in

conjunction with the court's conclusion that "[the] plaintiff ha[d] made a substantial showing

that his First Amendment rights [would] be infringed if an injunction [was] not entered." Id. at

1349. Therefore, the alleged constitutional violation was found to constitute irreparable injury per se, but only because the plaintiff had also demonstrated that he was likely to succeed on the merits of his constitutional claim.  Id.  Here, however, not only is the plaintiff not asserting that it is being deprived personally of a constitutional right, but it has also failed to make a showing that it is substantially likely to succeed on the merits of its constitutional challenge.[8]  The plaintiff has therefore failed to demonstrate that it will suffer irreparable harm if its request for an injunction is not granted.

    3.    <u>Injury to the Defendants</u>

Although the government defendants barely address this prong of the test, they do represent that a preliminary injunction will further compress the already tight schedule

---

[8] SoundExchange also claims that the plaintiff's delay in filing its motion precludes it from obtaining injunctive relief based on the doctrine of laches.  Int. Def.'s Opp'n at 23.  SoundExchange argues that under the laches doctrine, a court should not grant relief where the moving party failed to exercise due diligence and the party asserting the defense would be prejudiced.  Id. at 24.  SoundExchange claims that the plaintiff should have filed its complaint in January 2009 when the <u>Webcasting III</u> proceeding commenced, which would have allowed the court to adjudicate the matter before the July 10, 2009 decision by the District of Columbia Circuit not to address the constitutionality of the CR Board judges' appointments in <u>Intercollegiate Broadcast System, Inc.</u>, 574 F.3d at 755-56 (refusing to address the constitutional challenge of the CR Board judges' appointments because the issue had not been raised until the filing of a supplemental brief, which the court found was an "incomplete treatment of the Appointments Clause issue").  Int. Def.'s Opp'n at 25-26.  Furthermore, SoundExchange rejects the validity of the plaintiff's position that it did not file this action earlier because it was attempting to negotiate a settlement under the Webcaster Settlement Act of 2009, arguing that the plaintiff could have initiated this litigation while also pursuing an administrative settlement.  Id. at 25.  And, it points out that the plaintiff waited almost two additional months following the Circuit Court's decision in <u>Intercollegiate Broadcast System, Inc.</u>, before initiating this lawsuit.  Id.

The Court finds the laches doctrine inapplicable here.  Successful reliance on the laches defense requires that the movant prove "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."  <u>Pro-Football, Inc. v. Harjo</u>, 567 F. Supp. 2d 46, 53 (D.D.C. 2008) (citations omitted).  Here, as Live365 correctly asserts,  "[w]hen the CR [Board] announced commencement of the [<u>Webcasting III</u> proceeding] in January [last year], the Webcasting II appeal—where another party had raised the Appointment Clause [challenge]—was still pending, and it was as likely as not the D.C. Circuit would decide the issue." Pl.'s Reply at 11.  That being the case, it was not unreasonable for Live365 to conclude that any separate Appointments Clause challenge would have "either [been] unsound or moot" by the time the separate challenge would have been addressed.  Id.  Live365 then waited only two months after the District of Columbia Circuit refused to rule on this issue in <u>Intercollegiate Broad. System, Inc.</u>, and only several weeks after negotiations with SoundExchange failed , causing it to opt to participate in the <u>Webcasting III</u> proceeding before initiating this proceeding.  These periods of time—the delay prior to the issuance of the ruling in <u>Intercollegiate Broadcast System, Inc.</u>, the delay after the ruling, and the several weeks after negotiations failed—are far shorter than what has traditionally been found to constitute an unreasonable delay under the laches doctrine by a party.  <u>See, e.g.</u>, <u>N.A.A.C.P. v. N.A.A.C.P. Legal Defense & Educational Fund, Inc.</u>, 753 F.2d 131, 137 (D.C. Cir. 1985) (holding that thirteen year delay in resuming  negotiations with defendant constituted unreasonable delay); <u>Pro-Football, Inc.</u>, 567 F. Supp. 2d at 54 (finding an almost eight year delay in bringing trademark claim unreasonable delay).  The Court therefore declines to reject the plaintiff's request for injunctive relief on this ground.

confronting the CR Board judges to complete the Webcasting III proceeding due to the

Copyright Act's statutory deadline for the issuance of a decision in the proceeding by December

16, 2010.  Defs.' Mem. 41-42.  The plaintiff counters this concern, asserting that the defendants

are exaggerating the impact a preliminary injunction will have on the Webcasting III proceeding.

Pl.'s Reply at 33.  Specifically, the plaintiff asserts:

> To the extent the CR[ Board] as a matter of course takes the time necessary, as circumstances dictate, to conduct such proceedings, with resulting rates not applying until all its work is complete, even if that means the statutory royalty period is already underway, the risk of "compressing" Webcasting III is illusory. If Webcasting III is delayed by a preliminary injunction, the CR[ Board] (if it survives this litigation) can and will, just as it always has, take whatever time it needs before allowing new rates to take effect, even if it means that occurs after the statutory deadline.

Id. at 33-34.  Moreover, they argue that the September 29, 2009, deadline was a fiction created

by the CR Board judges, who in fact ordered the submissions a month sooner than what was

legislatively mandated.  Id. at 34.

SoundExchange, on the other hand,  specifically argues that it would be substantially

harmed for several reasons if the injunction is granted.  Int. Def.'s Opp'n at 29.  First,

SoundExchange contends that delaying the Webcasting III proceeding would likely prevent the

CR Board judges from establishing rates, which it is relying on being issued by the date of the

statutory deadline because "[e]ven assuming this Court elects to proceed in an expedited manner,

[the] losing party is likely to appeal" any ruling issued by this Court further delaying when the

new rates will take effect.  Id. at 30.  Second, it notes that failing to set the royalty rates prior to

the statutory deadline would have a disruptive impact on the music industry.  Id. at 31.  As proof

for this proposition, SoundExchange directs the Court's attention to the fact that the rates for the

current term were not set until seventeen months after the statutory deadline, resulting in many

copyright owners sustaining significant economic hardship because webcasters, like Live365,

were able to utilize tranmitted digital copyrighted sound recordings during the period of the delay without ever having to pay the new royalty rates.  Id. at 31-32.  Third, SoundExchange speculates that staying the Webcasting III proceeding "likely will cause some webcasters to stop paying the appropriate statutory rates, or otherwise complying with the terms of the statutory license, under a mistaken interpretation of the impact of the injunction."  Id. at 33.

The Court agrees that there would be some adverse impact on SoundExchange and the copyright owners if the plaintiff's request for an injunction were granted.  At the very least, the delay in setting new rates and terms would deny copyright owners the ability to timely receive the new royalty rates.  And consistent with SoundExchange's second argument that the industry as a whole would be disrupted by a stay, the District of Columbia Circuit in Intercollegiate Broadcast System noted that "[t]o hold the Librarian is not the head of a department . . . would invalidate the Judges' determinations and call into question the status of every registered American copyright."  574 F.3d at 756.  Considering the individual harm SoundExchange will suffer and the injury the music industry as a whole would potentially sustain if an injunction were issued, the Court finds that the third prong of the injunction standard weighs against granting the plaintiff's request for an injunction.

4.      The Public Interest

The plaintiff primarily contends that the public interest would be served by precluding the CR Board judges from moving forward in violation of the Appointments Clause, Pl.'s Mem. at 21, arguing that the public interest in promoting judicial economy will be advanced by not forcing it (and others similarly situated) to litigate the Webcasting III proceeding, "with the public bearing the CR[ Board]'s costs of conducting the proceeding, only to have the fruits of the proceeding—the CR[ Board]'s determination—set aside because the [CR Board] Judges have

been unconstitutionally appointed."  Id. at 21-22.  The defendants argue in response that the costs to the public that will possibly be saved by preventing an "unconstitutional" proceeding from going forward overlooks the point that "Congress set forth specific time periods for the various procedural and substantive steps participants [in the Webcasting III proceeding] must complete throughout a ratesetting or distribution proceeding in order to have new rates in place by the time old ones expire," and to disregard this legislative mandate and issue an injunction harms the public interest and "undermines the specific procedures that Congress has established."  Defs.' Mem. at 42-43 (internal citation, quotation marks, and alteration omitted). Furthermore, SoundExchange asserts that a number of copyright owners and statutory licensees will be adversely affected if the Webcasting III proceeding is stayed because without newly adopted rates "[l]icensees will not know what rates to pay, and some undoubtedly will simply refrain from paying . . . even as they continue to take full advantage of the compulsory license." Int. Def.'s Opp'n at 37.  The Court finds that all parties have presented compelling reasons why the public interest will be advanced by either granting or denying an injunction in this case. Therefore, the parties' positions are essentially in equipoise as to this fourth prong of the injunction standard.

### III.  Conclusion

The granting of a preliminary injunction is a drastic remedy.  Here, issuing an injunction would, at a minimum, disrupt the progression of  in the Webcasting III proceeding, and therefore inevitably delay its completion for an extended period of time. And because the plaintiff is unlikely to succeed on the merits of its constitutional challenges to the appointments of the CR Board judges, the absence of any non-financial injury it will suffer if an injunction is not granted, the harm the defendants would occasion as a result of the issuance of an injunction, and the public interest prong of the injunction standard not favoring either party, the plaintiff has

failed to meet the high burden required to obtain injunction. The motion for a preliminary injunction it therefore denied.

In addition, for the reasons set forth above, the Court also denies the government's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

**SO ORDERED** this 23rd day of February, 2010.[9]

REGGIE B. WALTON
United States District Judge

---

[9] This Memorandum Opinion accompanies the Order that was issued on September 29, 2009 and the Final Order issued on February 23, 2010.